THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOSEPH WOOD, Appellant.

126    249
148    494
126    249
149    267
149    327
126    249
154    172

Under the provision of the Code of Criminal Procedure (§ 542), declaring that after hearing an appeal from a judgment of conviction in a criminal case, "the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties," if competent evidence of a material nature offered by defendant has been excluded, and defendant has excepted, such ruling is an error requiring a reversal.

A substantial right of the defendant is affected in such a case even though the appellate court would, with the evidence before it, still come to the same conclusion as the jury did without it; the defendant has the right to insist that material and legal evidence offered in his behalf shall be received and submitted to a jury and its opinion and verdict taken thereon.

Where, in a criminal action, the defense is insanity the defendant has a right to prove upon this issue not only irrational insane acts and conduct, but also facts which may account for such acts and appearances, and which may reveal an adequate cause for the mental aberrations testified to.

Upon the trial of an indictment for murder, to which insanity was pleaded as a defense, after evidence had been given tending to prove a diseased condition of the defendant's brain, caused by injuries to his head, and, as a result thereof, irrational acts and declarations, the defendant's wife was called as a witness for him and an offer was made to prove by her that a short time before the day of the homicide, she had told

defendant that the deceased, who was her father, had stolen his potatoes; also, that the deceased had, on several occasions before her marriage, criminally assaulted and forced her against her will, and since her marriage, within a very short time, had come to their house, in defendant's absence, and similarly assaulted her and threatened to kill her if she told anyone. The counsel stated that he offered the evidence, not as proof of the truth of the statement, but he would show that defendant believed it and that it operated on his mind to such an extent as to render him insane on the day he committed the offense. This evidence was excluded, the judge stating that if it was admitted he would discredit it and would regard it as almost conclusive evidence that the witness was anxious to have her father murdered. and was operating in complicity with defendant. *Held*, error; that the evidence offered was competent, in connection with proof of subsequent conduct and appearance as showing the effect on defendant's mind, upon a brain which there was evidence tending to show was weakened and diseased; that it was material, as the fact offered to be proved might account for or tend to insanity; and that the competency of the evidence was not affected by the fact that it appeared the offense charged was committed with deliberation.

*Reg.* v. *Kelly* (2 Car. & Kir. 813); *Reg.* v. *Fisher* (8 Car. & P. 182); *Sanchez* v. *People* (22 N. Y. 147); *Shufflin* v. *People* (62 id. 229), distinguished.

Also *held*, that the remarks of the trial judge as to the testimony offered were improper and prejudicial to the defense, as it tended to discredit the witness as to material testimony given by her, in respect to which the evidence was conflicting.

The prosecution offered to prove by defendant's wife communications of a confidential nature, made by the defendant to her; they were objected to by defendant's counsel; the court held that it was not the right of the defendant to object, but it was the personal privilege of the witness, and she was put to her election, whereupon she declined to answer. *Held*, that the ruling was error.

The provision of the Penal Code (§ 715), providing that neither a husband nor wife can be compelled to disclose a confidential communication made by one to the other during their marriage, does not leave the matter entirely to the discretion of the witness, but the other party interested may object to any such communication, and upon such objection being made, the witness cannot be compelled, and has no right, to make the disclosure.

The prosecution was permitted to give evidence as to the conduct or appearance of defendant's wife after the killing, seemingly for the purpose of showing that she did not exhibit proper sorrow. *Held*, error.

Also *held*, it was competent for defendant to prove by a physician that upon a physical examination made by him of defendant subsequent to the homicide, he could determine satisfactorily in his own mind the condition of defendant's brain, and could state from such examination that

there was a disease affecting it of such long standing, that it must have existed at the time of the murder.

(Argued March 17; 1891; decided April 14, 1891.)

APPEAL from judgment of the Court of Oyer and Terminer of the county of Warren, entered upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*J. M. Whitman* for appellant. The photographs and the evidence given under them are but the mere conclusions of the witnesses and, as such, not competent. (*People* v. *Buddenseick*, 103 N. Y. 487, 500.) When a layman is examined as to facts within his own knowledge and observation, tending to show the soundness or unsoundness of the testator's mind, he may characterize as rational or irrational the acts and declarations to which he testifies. (*Clapp* v. *Fullerton*, 34 N. Y. 190 ; *People* v. *Conway*, 97 id. 62 ; *O'Brien* v. *People*, 36 id. 282 ; *Hewlitt* v. *Wood*, 55 id. 634 ; *Holcomb* v. *Holcomb*, 95 id. 316.) The defendant properly offered to prove the declarations of the defendant made long before the homicide, that there were times when he was crazy and did not know what he was doing. (Whart. on Ev. § 226 ; *Ins. Co.* v. *Mosley*, 8 Wall. 397 ; *A. L. Ins. Co.* v. *Warren*, 22 Am. Rep. 590 ; *People* v. *Eastwood*, 4 Kern. 465–471, 562, 566 ; 45 N. Y. 1 ; Greenl. on Ev. § 102 ; *People* v. *Montgomery*, 13 Abb. [N. S.] 207.) The taking of the defendant by the sheriff to a room out of the jail, and the examination of him there by physicians in the employ of the people, was improper as compelling him to be a witness against himself. (Const of N. Y. art. 1, § 6 ; *Roberts* v. *R. R. Co.*, 29 Hun, 154 ; *Parker* v. *Enslow*, 102 Ill. 272.) It was error to allow Dr. McDonald to give his reason for believing defendant sane. (*People* v. *Barber*, 115 N. Y. 475.) Evidence of a communication from a wife to a husband of a wrong done to her for the purpose of showing the effect of a communication upon the mind of defendant is proper. (*People* v. *Fair*, 43 Cal. 137 ; *People* v. *Cole*, 7 Abb. [N. S.] 321.)

*Francis A. Smith* for respondent. The exceptions taken by defendant upon the organization of the jury were not well taken. (Code Crim. Pro. §§ 362, 369, 371, 377, 386; *People v. Carpenter*, 102 N. Y. 247; Code Civ. Pro. § 1058; *People v. Jackson*, 111 N. Y. 369; *People v. McQuade*, 110 id. 392; *Balbo v. People*, 60 id. 484; *People v. Beckwith*, 103 id. 369.) Unless the defendant was insane at the time of the homicide, there can be no question of his guilt, and upon the whole proof, including that in relation to his mental condition, it cannot for a moment be urged that the verdict was against the weight of evidence. (Laws of 1887, chap. 493.) Some days after the murder photographs were taken by placing a living body in the position of the deceased. They were shown to be correct representations of the scene of the homicide, of the dead body, and of the position of the persons about it, and were offered and properly received in evidence. (*People v. Jackson*, 111 N. Y. 370; *People v. Fish*, 34 N. Y. S. R. 840.) Proof of defendant's confession was competent. (Code Crim. Pro. § 395; *Murphy v. People*, 63 N. Y. 590; *People v. Druse*, 103 id. 655; *Balbo v. People*, 80 id. 484; *People v. Chapleau*, 121 id. 266.) The rule as to the competency of opinions by lay witnesses was not violated. (*Clapp v. Fullerton*, 34 N. Y. 190; *O'Brien v. People*, 36 id. 282; *Beal v. People*, 42 id. 270; *Howlett v. Wood*, 55 id. 634; *Rider v. Miller*, 86 id. 507; *In re Ross*, 87 id. 514; *Holcomb v. Holcomb*, 95 id. 322; *People v. Conroy*, 97 id. 62; *People v. Packenham*, 115 id. 200.) The evidence sought to be introduced, relating to oddities of dress displayed only on two or three occasions, during defendant's early life, when, as the witnesses state, they observed no irregularity in his manner, conduct or speech, was cumulative and properly rejected. (*Tooley v. Bacon*, 70 N. Y. 37.) Proof of personal examination by the medical experts was proper. The defendant's objection on the ground that such proof was " an indirect invasion " of his constitutional right, and compelled him " to give evidence against himself," is untenable. (*People v. Kemmler*, 119 N. Y. 580.) The offer to prove by the prisoner's wife her

statement to him, one week before the homicide, that her own father, the murdered man, had outraged her, and that the statement was true, was properly excluded. (*Shufflin* v. *People*, 62 N. Y. 235; *Stokes* v. *People*, 53 id. 174; Penal Code, §§ 21, 715; *Sanchez* v. *People*, 22 N. Y. 147; *Flannigan* v. *People*, 52 id. 468; *Walker* v. *People*, 88 id. 86; 26 Hun, 74; *Boswell* v. *State*, 35 Am. Rep. 25; *Cunningham* v. *State*, 31 id. 367.) The court properly charged that the burden of proving the defendant irresponsible, is upon the accused. (Penal Code, § 17; *Walter* v. *People*, 32 N. Y. 164; *Ferris* v. *People*, 35 id. 129; *O'Connell* v. *People*, 87 id. 377; *Walker* v. *People*, 88 id. 88.) The court properly charged that the defendant was responsible if he was able to distinguish between right and wrong. (*Wallis* v. *People*, 32 N. Y. 715.) The court was correct in charging that mere oddities and eccentricities of character and habit, or peculiarities of temperament which do not destroy the mental powers of a person, are not the kind of insanity which render a defendant irresponsible for crime. (*People* v. *Kemmler*, 119 N. Y. 583.) The charge of the court that the case must be proved so that the jury are convinced of the guilt of the prisoner beyond a reasonable doubt, and if, after the consideration of the whole case and the full consideration of the evidence, they still have reasonable doubt, the prisoner is entitled to the credit of it, was correct. (*People* v. *Stone*, 117 N. Y. 480; *Walker* v. *People*, 88 id. 87–89; *O'Connell* v. *People*, 87 id. 377; *Moett* v. *People*, 85 id. 374; *People* v. *Greenwall*, 115 id. 526.)

PECKHAM, J. This is an appeal from a judgment of conviction of defendant of murder in the first degree, entered upon a verdict rendered by a jury in the Oyer and Terminer of Warren county, in September, 1890.

Our jurisdiction to review directly such a judgment rests upon the statute, chapter 493 of the Laws of 1887.

Under that statute this court can grant a new trial upon exceptions taken to the rulings of the trial court, and it can also grant such new trial when it is satisfied that the

verdict was against the weight of evidence or that justice requires it.

The defendant, through his counsel in this case, does not seek our interference under the latter provisions of the act. He comes here upon exceptions and asks a review thereof as his legal right, and that a new trial shall be granted him because of legal error committed by the court below on his trial.

Where exceptions have been taken by a defendant on a criminal trial the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties. (Code of Crim. Pro. § 542.)

Under this provision I think it plain that if evidence of a material nature, of a kind most important and predominating, shall have been offered on the part of defendant and ruled out on the objection of the people and under the exception of the defendant, such ruling is error, which demands the reversal of the judgment of conviction. This is true, even if the court might be inclined to think that upon the whole, with such evidence admitted, the defendant should have been convicted. A defendant in a criminal prosecution is entitled to a legal trial, conducted in a proper way and decided upon legal evidence. Where evidence of such a character has been offered on the part of the defendant, and erroneously rejected by the court, and if it is of a material nature, and if an exception has been duly taken, we are not at liberty, under the section of the Code of Criminal Procedure above cited, to say that the error is merely technical, or that the substantial rights of a defendant have not been affected. The defendant has the right to submit material evidence in his behalf to the jury in order that it may pass upon its weight and credibility, and if he be deprived of that right, it is a substantial one which, when properly presented to this court by an exception, will require a reversal of his conviction. This does not in the least affect the existence and force of the other and well-known rule that a new trial will not be granted even in a criminal case for an erroneous ruling of the court upon some legal proposition

where the appellate tribunal can see that by no possibility could the error have worked any harm to defendant. (*Stokes v. People,* 53 N. Y. 164.)

In the case of the rejection of important, material and competent evidence for the defendant, this court cannot say, unless in a most extraordinary case, that by no possibility could the error harm the defendant, or that such error was only technical and that no substantial right of the defendant was affected. A substantial right of defendant in such case is affected, even though the appellate court would, with the evidence before it, still come to the same conclusion as the jury did without it. The defendant in such case has the right to insist that material and legal evidence offered in his behalf shall be received and submitted to a jury and its opinion and verdict taken thereon, and not that of any merely appellate tribunal.

On looking through and reading attentively the very voluminous record which has been presented to us in this case, I am satisfied that many errors were committed upon the trial, and in the case of one, at least, the error is of such a nature as to necessitate the reversal of the judgment.

A brief reference to the general facts of the case is all that is necessary to enable one to see the materiality of the evidence rejected by the court when offered on the part of the defendant. The evidence on the trial showed that the killing took place near a small village or hamlet called Stony Creek, in the county of Warren, about 5 or 5.30 P. M., on the 10th of May, 1890. Leander Pasco, the deceased, was a small farmer or laboring man, living within a couple of miles of the above-named village, and was between 50 and 55 years of age. His wife had been dead a few years, and his daughter, about ten years of age, was living with him, as was also a woman who occupied the position of his housekeeper. His sons, George and Alvin, respectively about twenty and sixteen years of age, were sometimes there, but had not been for a short time before the killing. A couple of months before that event, the defendant had married a daughter of Pasco, and it is claimed that such marriage annoyed him, and he had ceased to be on friendly

terms with defendant from that time. The marriage took place away from home, and Pasco did not know of it at the time. A few weeks before the killing, the defendant took his wife and went to a small house, or "shanty," as some of the witnesses called it, about a mile from Stony Creek, and there commenced housekeeping. There was evidence tending to show that defendant was exceedingly fond of his wife, who was a young woman twenty-two or twenty-three years of age. The defendant was a man about thirty-five years of age, and was also a small farmer or laboring man. Both the deceased and defendant belonged to a very uneducated, illiterate and ignorant class, neither having acquired much property, and both spending a portion of their time in hunting and fishing.

On the afternoon of the tenth of May (the day of the homicide), both men were seen in the village of Stony Creek, and were overheard in a war of words in the public streets, in which each accused the other of misconduct. The defendant was seen on his way home about 3 or 4 o'clock in the afternoon, and the deceased was seen passing out of the village in the direction of the road to his home, about 5 or 5.30 in the same afternoon. It was raining, and the deceased carried an umbrella and a small bundle covered over with paper. A short distance from the village, and as the deceased was proceeding upon a lonely road, lined on each side with bushes and woods, except a portion of one side where a small fallow of a couple of acres skirted the edge of the road, he was shot in the back by shot from a gun and was instantly killed. No one saw the killing, and, although two reports of a gun were heard in quick succession at about half after five, the deceased was not discovered until nearly dark, when he was accidently seen lying in the road by a man walking along it on his way home. The alarm was given, and the next day, Sunday, a critical examination was made. From it the people discovered the rags which had formed the wadding of the gun, footprints in the fallow from peculiar boots which were soon seen to be exactly like those made by the boots worn by the defendant, who was present on the Sunday at the place where

the body lay and where quite a crowd had congregated. The rags were seen to be like the lining of defendant's coat, which was torn, and were subsequently most satisfactorily identified as coming from and forming part of such lining.

Other evidence was given which it is unnecessary to detail, but the whole showed quite satisfactorily that the defendant had perpetrated the killing. He had, however, in addition to the plea of not guilty, put in the further plea of insanity, and evidence bearing upon that defense was offered and received.

Evidence was given tending to show that the defendant, when a young boy, had been severely cut in the head by a blow from an axe which had slipped out of the hands of his father who was cutting wood, and there was evidence from which the jury might infer that the skull had been then fractured. He was unconscious for two or three hours, and was for some time quite ill from the immediate effects of the blow. Within a few years thereafter he fell from a barn and struck on his head on a stony surface, and was again rendered unconscious for some hours. After these injuries it was claimed that he frequently acted in a strange manner, not as he had formerly done. He often complained from that time of violent pains in his head which rendered him unable to work. He had been guilty of acts which those who saw them characterized as irrational, such as pounding with his fist a lath and plaster wall until he had made a hole in it, without any apparent cause and while sober, and claiming the next day not to remember anything about it. He had dressed in an eccentric and odd manner, in woman's clothes over his trowsers, which were cut off below the knee, and in a woman's bonnet, and in such apparel had gone to "meeting" and to school, although then grown up. He had been seen to trade off a good hat for a large hornet's nest, which he wore on his head instead of his hat for a long time. He was subject to some kind of discharge from his eyes, which difficulty would suddenly come upon him after he had complained of his head.

He was also subject to sudden attacks of a kind of dizziness in the head and temporary blindness consequent thereon, and had himself denominated such attacks his " blind staggers."

He was eccentric and was called odd, very vehement and subject to great excitement on slight provocation.   After his incarceration in jail on the charge of murder, he was examined by a physician who claimed to find traces of the wound on his head, also what he thought was a fracture of the neck near the base of the skull, the effect of which was to prevent the defendant from turning his head as much as the ordinary man can. He also thought that he discovered that the spine from the base of the skull down to what he termed a tumor between the shoulders was quite sensitive to the touch, so that the defendant flinched when that portion was touched by the physician.   The eyes were not then properly responsive to light, and there was a lack of proper sensitiveness of the skin under experiments then made by the doctor.   From the examination thus made the doctor was of the opinion that the defendant was suffering from a diseased brain.   Other witnesses spoke of occasions when the defendant seemed unable to count money which he had in his hand, and asked others standing by to count it for him, and at such times his conduct seemed to the witnesses irrational.

This was substantially the evidence upon the question of the insanity of the defendant or the diseased condition of his brain at the time when the wife of defendant was called as a witness for him.   Counsel for defendant offered to prove by her that a short time before the day of the homicide she had told the defendant under the circumstances set forth in the offer that her father had stolen his, defendant's potatoes, some three years before.   This was offered for the purpose of showing the effect it had on defendant's mind in connection with other matters. This was objected to as immaterial and incompetent, and sustained, and the defendant excepted.

The defendant's counsel then proved that the witness had another conversation with her husband on the third of May, the week preceding the homicide, in which, as the record

states, she gave "him some information as to certain acts which her father had committed upon her person."

The counsel for the defendant then asked her to state what it was she told her husband. This was objected to, and the record then shows the following most extraordinary proceedings:

BY THE COURT — The same rule will apply to this offer as applies to the other. I sustain the objection and rule the evidence out upon the grounds:

First. That it raises a collateral issue which is not on trial here, and ought not to be introduced; that conversations between this party and the defendant are not competent evidence in his favor in this action.

Second. It is clearly not a case where Pasco was killed upon sudden provocation or sudden excitement, in consequence of some extraordinary and unexpected and sudden information to this defendant. It is not competent as a defense to show the provocations, that discoveries were made, where the murder was committed with a kind of deliberation which is clear and evident in this case, and

Third. It is a proposition to try an indictment against Pasco, deceased, against the dead man, a crime which this witness would be obliged to confess she voluntarily participated in. It should have been brought to trial in the life-time of her father, when he could have been here to have been heard on the subject. It would be a gross piece of injustice if after this defendant and this witness, instigating him to commission of crime, and to cause the murder of her father, the defendant should be allowed to set up and establish this infamous charge against the dead man, whose mouth is closed forever. It would be no justification of the murder, and under such circumstances if this female had become so abandoned as to be willing voluntarily to go on the stand and thus testify to a case against her own dead father, who had been murdered, that would throw infamy and discredit eternally upon his reputation as well as hers, she ought not to be permitted to do it. It is an issue that does not belong to the case here, and it would not be of any value

under the circumstances in this case and ought not to be, if it were admitted. The defendant is at liberty to furnish any evidence that he is able to on the subject of the mental condition of this man. That is the defense, but I do not propose if it is possible to avoid it, to undertake to try the dead man instead of the defendant who is on trial here.

COUNSEL FOR DEFENDANT — It is apparent, from the applause of the audience that incestuous rape is considered a venial offense.

BY THE COURT — As the counsel has made that statement I will state that this court will discredit the story of this female, and I think any person of intelligence would do it if she was permitted to give testimony.

Defendant excepts.

The counsel for the defendant then offered to prove in detail that the witness told the defendant on the evening of the 3d of May, the week before the homicide, that her father had before her marriage to the defendant criminally assaulted her and forced her against her will to have intercourse with him on more than one occasion, and that since her marriage and within a very short time he had come to their house in the absence of defendant and had successfully made upon her the same kind of an assault and had threatened her that if she told of it to her husband or any one, he would kill her. The counsel said he offered the evidence not as proof of the truth of the statement, but he would show that the defendant believed it, and it was offered for the purpose of showing the effect of the communication on defendant's mind, and that it operated on it to such an extent as to render him insane on the day he committed the offense.

This evidence was objected to and the objection sustained and the defendant excepted. The record then proceeds:

BY THE COURT — If the evidence was admitted I would regard it almost conclusive evidence that this woman herself was anxious to have her father murdered, and that she was operating in complicity with this man to put up the business, and do an act of this kind. I sustain the objection and over-

rule the offer on the ground that it is plainly apparent in the case as it stands, that it is not a case where a person who committed the crime was moved by sudden impulse. Whoever committed that murder did it with great deliberation, both of mind and plan and surroundings.

COUNSEL FOR DEFENDANT — Defendant excepts to the ruling of the court.

The defendant's counsel made other offers of the same nature and in detail, which were overruled, and the counsel was somewhat severely criticised for making such offers.

The first question that arises is as to the correctness of the ruling of the court in excluding this proposed evidence. I think the learned court clearly erred.

The counsel for the prosecution seek to sustain the correctness of the decision by referring to those English and American authorities which hold the individual guilty of murder in killing the man who has committed adultery with the prisoner's wife, unless the person killed is detected in the very act of such adultery. (See cases collected in 9 Am. & Eng. Enc. of Law, 585, note 1.) The cases proceed upon the principle that the immediate killing of the adulterer by the husband who has detected him in the act was probably perpetrated under such a sudden and uncontrollable passion that the offense was reduced from that of murder to manslaughter. But, if the husband only heard that the person had been guilty of such an act, and thereupon met or sought him out and killed him, it has been held that in such case, as time enough had elapsed for the passion to cool, the killing was murder. *Reg.* v. *Kelly* (2 Car. & Kir. 814) is to this effect, although in that case it was the woman who was killed. To the same effect in principle, *Reg.* v. *Fisher* (8 Car. & Payne, 182). There are many other authorities of the same purport, both English and American.

In this state it has been held that the fact that information of the wife's adultery had been imparted to the husband can only be proved when it is shown that such information was given so near the time of the commission of the crime that

the court can see there was not a sufficient period for the passion it would naturally excite, to subside. This was held in the case of *Sanchez* v. *People* (22 N. Y. 147). That defense was not insanity in the proper sense of the term. The word was used as a mere figure of speech by which to describe the defendant as possessed by a strong and irresistible passion.

These cases proceed upon the theory that the passion such a discovery or communication may excite in the breast of a man whose brain is in a normal condition is sudden, irresistible and deadly, and the evidence is admitted to show the existence and the cause of such a passion at the very time of the commission of the crime, and so, to show that it was not of the deliberate nature implying an intent to kill, which is required in the case of murder. Upon such facts the claim is made that the crime is only manslaughter; that the act was committed in the heat of passion and without intent to kill, and the evidence is received to show an adequate cause for the passion and the absence of the intent. If the intent to kill existed it might still be murder in this state. (*Shufflin* v. *People*, 62 N. Y. 229.) Of course, on this theory proof of this communication to the defendant and its nature, occurring as it did at least a week before the commission of the offense, would be inadmissible, for a week is a period much more than enough for the cooling time allowed by law. I agree with the trial judge that the inference from the evidence is substantially irresistible that the person firing the gun did so with deliberation and intended to kill. It is not, however, upon any theory of the kind above mentioned, that the evidence is admissible. It should be admitted for the purpose of showing an adequate cause for the state of mind existing subsequent to the communication. The subsequent conduct, appearance and conversation of the person to whom the communication is made are the proper subjects of proof, for the one purpose of showing what effect upon him such communications had, and that it rendered him insane within the legal definition of the term at the very time of the commission of the deed. Evidence had already been given

tending somewhat toward proof of a diseased condition of the brain of the respondent before the communication was made to him. Evidence of such a nature having been given, the communication may then be proved for the purpose of showing the effect it had upon the defendant's mind, and to show a reason for the alleged change in the appearance and conduct of the accused and to prove that in truth such communication acting upon a diseased and weakened brain produced insanity at the time of the commission of the crime. It is not disputed that a fall on the head, a physical injury to the brain, or other physical and sufficient cause for insanity can be proved. The defense is not confined to proof of the condition of the mind of defendant at the moment when he struck the blow or fired the shot. Any material fact which might account for or naturally lead to insanity at that moment may be proved. Why should not the defendant have the right to prove a moral cause which might act upon a brain already diseased and might result in insanity as naturally as blows upon the head? This in connection with evidence tending to show insanity at the time of the act done, is proper. I do not say that proof of these facts, any or all of them, is proof of insanity. That is for the jury to decide. But it is competent for the reason that all the facts are material for the purpose of enabling the jury to say what was the condition of mind of defendant when the deed was perpetrated. The defense is entitled to prove more than the fact that after a certain time when something was told defendant he exhibited certain changes of deportment or appearance. He is entitled to have the jury see that there was a cause sufficient to account for and to create such alteration in conduct and appearance. It greatly tends to strengthen the proof of such alteration. It is admissible for the same reason that evidence is competent to show that the party had a fall on his head, or had been a sufferer for years from some kind of physical ailment which had naturally a depressing influence on the mind. The physicians for the defendant all laid great weight upon the original injuries to the head and to the character of the communication made to defendant by his wife.

The defense has the right to more than proof that defendant was a singular person, sometimes seemingly wild and guilty of foolish actions or such as might be termed irrational acts or speeches. Facts may be shown which might account for such actions and appearances, and which when submitted to competent medical skill might be said to reveal a full and adequate cause for the mental aberrations testified to, or they might be of such a nature that the ordinary man, not a physician, could from his own experience say that they were enough to account for such mental condition. In fine, the evidence is admitted on the ground that it is corroborative, more or less strongly, of the mental condition which the other and separate evidence in the case tends to prove. It must be admitted for the purpose of showing that the defendant was at the time of the commission of the offense insane within the legal definition of the word. It may well be that in many instances the evidence will fail to create even a doubt in the minds of the jury as to the sanity of the defendant when the deed was committed. That does not detract from the admissibility of the evidence. The defense will in that event fail to make out the case. This species of evidence was admitted in the case of *People* v. *Cole,* tried in the Albany Oyer and Terminer some twenty years ago, and it was admitted on the ground taken here. There had been a large amount of evidence already given to show, prior to the communication, a diseased and depressed mental condition of the defendant, and the communication made to him by his wife was admitted as evidence for the purpose of showing its effect upon his mind, and as furnishing an adequate cause, under all the circumstances, for the alleged fact that he was insane when the act was done. This was the claim of the defense, and it was the theory upon which the evidence was competent, and it is not admitted as showing the truth of the communication. Still less is it admissible for the purpose of showing sudden passion. The communication is too remote in time from the act to render the evidence competent for that purpose. It is not, however, necessary that the evidence should already show that the defendant was actually insane. If that were so the

defendant would be entitled to an acquittal without it. In this case, however, evidence had already been given upon the subject which, as I have said, somewhat tended to show that the individual before the communication was made to him was a person suffering from some diseased condition of the brain, and the actual effects of such disease in the way of irrational acts and declarations, had been somewhat more or less remarked by others. When such facts have been shown the evidence is not affected as to its competency by the fact that the act for the commission of which the defendant is on trial was committed deliberately. Deliberation is the answer which the prosecution makes to the defense of ungovernable passion suddenly evoked by the sight of an unfaithful wife in the arms of her lover. If, instead of taking immediate vengeance upon the man the husband postpones it, and subsequently kills the adulterer, the law says the cooling time was sufficient, and the deliberation shows the necessary intent to commit murder. The evidence is admissible in this case upon the totally different theory already discussed.

Whether it is necessary in all cases where the defense of insanity is interposed, to show the existence of a prior morbid and diseased condition of the mind before evidence of the nature offered in this case should be admitted, is not now the question. We think there was enough evidence tending somewhat in that direction to render the proposed evidence competent even upon such restricted theory. The case does not require it, and we do not hold that the evidence is admissible in any event. We defer the discussion of the question until it necessarily arises. To show that the effect was, at most, the putting of a party in a blind, reckless, passionate or vindictive mood, is no defense.

The case of *Spencer* v. *State of Maryland* (69 Md. 28), is not opposed to these views. The counsel for the defendant there offered to show by the defendant himself his mental condition (but not that he was insane) at the time of the killing. It was rejected unless the counsel would give the assurance that he would follow it up with other proof tending to show

that at the time of the homicide the prisoner was insane, and that assurance the counsel declined to give.

The refusal to admit the evidence was upheld by the Court of Appeals of Maryland on the ground that the offer did not tend to show the defendant insane at the time of the homicide, within the legal definition of that term. No fault can be found with such ruling.

In this case it cannot be asserted that the evidence of insanity given up to the time when the defendant's wife was called was very strong or very convincing. There can be no doubt, however, that it came up to the requirements of the rule which has been assumed as a condition for the admission of evidence of the nature offered herein.

The counsel for the prosecution does indeed take the objection that when this proof was offered there was no evidence that the defendant was insane when the crime was committed, and none that tended to prove it. I have already alluded to some of the evidence upon that question which had been taken, and after the court ruled upon this offer, Doctor Martine was again called to the stand, and upon a hypothetical question put to him by defendant's counsel, testified that in his judgment the defendant was insane at the time of the commission of the homicide. The defendant's wife was then recalled and the same offer to prove the facts already related was made and the same ruling given and an exception taken. I think it cannot be said that the hypothetical question put by defendant's counsel to the physician was so utterly baseless that it could find no support in any possible view of the evidence in the case, assuming such evidence to be true. The court did not exclude evidence of the communication on any such ground, but placed its ruling on the ground that the evidence was in its very nature wholly inadmissible for the reasons which he then gave. In stating that one reason for the rejection of the evidence was because it appeared that whoever committed the murder did it with great deliberation, the court thereby, in substance, held that evidence of this nature was only admissible to prove a sudden passion, perhaps a phrenzy on the part

of the person hearing the communication and the immediate commission of the crime in that present condition of rage, and hence evidence of deliberation destroyed the foundation for its admission. But herein the court totally misapprehended the principle upon which the evidence was admissible. Upon that principle, which I have already so fully discussed, deliberation is not in the least inconsistent with the legal insanity of the person deliberating, and hence the fact of deliberation offers no obstacle to the reception of the evidence. An insane man frequently deliberates, and after the most mature deliberation commits acts which, but for his insanity, would be crimes. The question always is not did the party deliberate, but was he at the time insane within our legal definition of that term.

The counsel for the prosecution also argue that the defendant did, as matter of fact, have the benefit of the evidence ruled out, as in the hypothetical questions afterwards submitted to the physicians called by the defendant, the fact was assumed that the defendant had received some communication from his wife of a nature to cause a great moral shock to him, and that the physicians had declared that such fact had a most important bearing upon the question.

It is true that the counsel for the defendant did include this matter in one of the hypothetical questions put to the physicians, but the question was objected to by counsel for the people as assuming proof not in the case, and though overruled by the court, yet, in permitting the question to be put, the court said in addressing counsel for the prosecution: "You are entirely right in the fact that there is no such proof in the case before the court. * * * I agree with you that there is no evidence to sustain the information upon which the question is founded." The court allowed the question on the ground that the rule permitted counsel to make any hypothesis he pleased, whether supported by evidence or not.

In the charge of the learned judge, he said to the jury that there was no evidence "before the court as to what communications, if any, that is, of what nature and character of communications passed between the defendant and his wife pre-

·ceding the killing, and if there were such evidence that would not in any event constitute a justification."

In this light, the amount of benefit which the defendant derived from the fact in question- is, of course, absolutely without weight.

But again, it is said that the defendant suffered no harm by this ruling even if erroneous, because the only insanity which the evidence in the case tended in the slightest degree to establish was, as counsel claimed, of that kind called by some moral insanity, where the person is said to be able to distinguish between right and wrong and to know that the act which he is about to commit is a crime, but he is impelled to do it by an overpowering impulse which masters his will and leaves him helpless. Such a species of insanity constitutes no defense for the commission of crime. (*Flanagan* v. *People*, 52 N. Y. 467.)

If the claim of counsel were founded upon undisputed evidence and upon all proper inferences therefrom which could possibly be drawn, and if they all tended only in the direction of proving that kind of insanity, this court might accede to the statement and ignore the error. But this is by no means the case. The physicians themselves who were called for defendant think that upon the hypothesis of the defendant as contained in the questions presented to them, he was so far insane as not to know the nature and character of the act or that it was wrong. It is true that in cross-examination as to the point of insane impulse, etc., as presented by counsel for the prosecution, some of them said they thought a person thus actuated knew the character of the act, and that it was wrong. And they somewhat tended to the opinion that of the different kinds of insanity spoken of by some authors, the evidence rather pointed to homicidal impulse on the part of the defendant. But they all said it was exceedingly difficult to determine the exact character of the disease in many cases, and that the fullest kind of knowledge of all the surrounding facts of any particular case was sometimes necessary before they could form an intelligent opinion of the exact nature of the insanity afflicting the person and the amount of his knowledge of right

and wrong.   It is to be also observed that the general conclu-
sion of the medical witnesses for the defendant, summed up
after various cross-examinations, was that the defendant, upon
the facts assumed by his counsel in his question, was so far
insane as not to be conscious of the difference between right·
and wrong, or that the act he committed was wrong.   In this
condition of the evidence it is clear that there is not such cer-
tainty of the character of the insanity of defendant, assuming
the existence of any, that the court is enabled to say, as mat-
ter of law, it was of that kind which furnishes no defense.

That must be a question to be submitted to the jury under
proper instructions as to what constitutes insanity within the
meaning of the law.

In this case I do not think we should strive to see if we
cannot guess that the error of the court affected no substantial
right of the defendant.   However strong the evidence tending
to show his guilt may have been, he was entitled to a fair trial,
and in view of the facts appearing on the face of this record
we greatly fear that he has not had it.

The learned judge, in his zeal for the due administration of
justice and for the punishment of crime, stepped wholly out-
side of his province in stigmatizing in the language used by
him the character of the witness by whom the counsel for the
defendant offered to prove the facts above alluded to.   Under
the circumstances it was very much in the nature of a charge
to the jury, and it was duly excepted to.   It was unfair to the
witness because, from the offer made by defendant's counsel,
it appeared that she was not a consenting party, but that she
had been overpowered, and in that condition a revolting crime
had been perpetrated upon her.   The statement that she ought
not to be believed if she gave such evidence, and the assump-
tion by the court that she instigated defendant in the commis-
sion of the crime, were most damaging to the witness in regard
to the testimony which she did give in the case, for the offer
presupposed the willingness of the witness to testify to the very
facts which the court said ought not to be credited even if
sworn to by her.   There was no legal ground for the rejection

of her testimony, and its credibility was altogether a question for the jury. Some of her evidence was of quite important a nature, especially that which described the effect this communication had upon the defendant. She testified that he was from that time sleepless, restless, walking the floor nights, refusing his usual amount of food, and that his habits changed in regard to the care and attention which he had theretofore paid to his stock and his work, neglecting both and brooding over his troubles. All this was quite material evidence, and as it was substantially contradicted by the sons of the deceased who boarded with the defendant during this time, the question became a most material one as to the credibility of the wife. It was, therefore, most unfair and improper to thus characterize the witness and her proposed testimony, and it plainly prejudiced the defendant in his defense. The court committed an error in rejecting the evidence in the first place, and in subsequently making the remarks which he did in ruling upon the offers of counsel. The record shows nothing in the conduct of the latter calling for the least unfavorable comment by the court.

It must be borne in mind that this court does not assume to say the evidence on the part of the defendant should all be believed, or that if believed it did, as matter of fact, show the defendant so far insane as to be irresponsible for the act he committed. That is the very question for the jury to decide. The evidence on the part of the people must be taken into consideration on this question, and that evidence, as qualifying and explaining the evidence of defendant, we are bound to say was of great force, gathered from many different sources, and altogether made a most formidable answer to the case on the part of the defense. We only say there was some evidence on his part which rendered it proper to admit this other evidence in question, and the whole should have been submitted to the jury under such proper instructions as would save the rights both of the defendant and the prosecution. The denial of that right was error, and the manner and terms of its denial were anything but proper or appropriate.

We think other errors were committed upon the trial.

One was in regard to the right of the defendant to object to his wife giving any evidence of confidential communications from the defendant, her husband, to her. The court held that it was not the right of the defendant to take the objection, but that it was the personal privilege of the wife, and she was put to her election whether she would answer or not, and she thereupon declined to answer. To this ruling the defendant objected and duly excepted. I think the decision, while, as a result, keeping out the alleged confidential communications, yet did so by improperly extracting a *quasi* admission from the wife that the communication was of a nature to hurt the defense. If the defendant had the right to object, and to thus relieve the witness from any such partial admission, I think the exception was good, and not merely of a technical nature. Perhaps the judgment would not be reversed for that error because it would seem that the communications had already substantially been proved. But I believe the ruling was in its nature erroneous. The common-law rule that husband and wife cannot be witnesses for or against each other has been modified by the Penal Code (§ 715). That section makes a husband or wife of a person indicted or accused of crime in all cases a competent witness, but "neither a husband nor wife can be compelled to disclose a confidential communication made by one to the other during their marriage."

We are of the opinion that this section does not leave the matter entirely to the discretion of the witness, but that the other party interested may object to any such communication, and that upon such objection being made the witness not only cannot be compelled, but that he or she has no right to make the disclosure.

We think evidence as to the conduct or appearance of the wife of the defendant subsequent to the killing was also inadmissible. The wife was not on trial, and was accused of no crime, yet several witnesses were permitted to give evidence as to her appearance at various times after the killing, seemingly for the purpose of showing that she did not exhibit the

proper feeling of sorrow upon such an occasion. Whether she did or not was no subject for investigation on this trial, and was an improper means of attempting to impeach her evidence. It is also plain that if Doctor Martine were able, from a physical examination of the defendant subsequent to the killing, to determine satisfactorily in his own mind the condition of the brain of the defendant, and could also state from such examination that there was a disease and of such long standing, affecting it, that it must have existed 'when the killing was perpetrated, the defendant is entitled to the evidence. I have some doubt whether the doctor came up to that point in his evidence, although counsel for defendant assumes he did in his argument. We are far from clear that he did, and we should not reverse on the ruling excluding the offer to show it by the doctor.

Upon the whole case we are without doubt as to the propriety and necessity of reversing this judgment. If the defendant be guilty it can be shown on another trial conducted more in accordance with the rules of law than was the one under consideration.

For the reasons already given the judgment should be reversed and a new trial granted.

All concur.

Judgment reversed.