STATE v. WOODFIN GREEN.

(Filed 17 May, 1910.)

1. **Murder—Transitory Insanity—Communications to Prisoner—Evidence.**

   The defense in a trial for murder being a plea of transitory insanity caused by the communications of the prisoner's wife to him of deceased's improper conduct towards her, evidence is competent by the wife of what she had told her husband, as it was upon this communication that the prisoner acted in committing the deed and was claimed to have caused the insanity; but evidence of the truth or falsity of the communication was immaterial and incompetent, as also the reason why the wife called the prisoner away from the house of deceased early in the morning before she had communicated to him the occurrences of the night before upon which the plea of transitory insanity was founded.

2. **Murder—Transitory Insanity — Defendant's Character — Drink—Evidence.**

   The defense in a trial for murder being a plea of transitory insanity caused by the communication of the prisoner's wife to him of deceased's improper conduct towards her, it was competent for the prisoner, not examined as a witness, to offer testimony of his good character and for the State to offer testimony that prisoner was "two-thirds" drunk on the morning of the homicide, and under such conditions was violent in speech and conduct, being directed to the plea of "transitory insanity."

3. **Evidence—Irrelevant Answers—Procedure—Appeal and Error.**

   When the answers of witnesses are not responsive to the questions asked by defendant, and objectionable as incompetent, the defendant should ask that they be stricken out and that the judge direct the jury not to consider them.

APPEAL from *Councill, J.,* at November Term, 1909, of MITCHELL.

Indictment for murder.

The prisoner was convicted of murder in the second degree, and from the judgment of the court appealed. The evidence tended to prove that the prisoner shot and killed Ed. L. Young on 9 September, 1909, about 12 o'clock in the day; that prisoner entered the house of the deceased while he was asleep, shot twice in the ceiling of the room, presumably to awaken the deceased, and then shot him four times. Death resulted in a few minutes. As prisoner walked out of the house he was asked what was the matter, and he replied that "there was a man hurt, and hurt bad, and that I had better come and take care of him."

The prisoner, not having offered himself as a witness, rested his defense upon the plea of insanity—transitory insanity; that

this condition of irresponsibility was occasioned by a statement to the prisoner by his wife a few hours before the homicide. The prisoner was engaged in working at night, in or about the Cranberry mines, and on the morning of 9 September, about 6 o'clock, he came to his home, met the deceased at his gate and walked with him to his home, a distance of about 300 yards; in a short time prisoner's wife came for him; they went to their house, ate breakfast, and, as was his custom, prisoner went to his bedroom to sleep. In a short time prisoner's wife came in the room, lay down on another bed, and, thinking the prisoner asleep, began to cry. The prisoner was not asleep, but upon his inquiry as to what was the matter, the wife narrated this occurrence: "Fin, Ed. Young made me drunk last night and overpowered me, and threw me back on the bed and, in spite of my efforts and my telling him to leave, he accomplished his purpose. Young said to me, 'God damn you, I have fixed you.'" That the prisoner jumped up in the floor, wringing his hands and saying, "I want my pistol; I want my pistol! My life is wrecked, my home is ruined!" That she refused to give him the pistol, having hidden it; that prisoner demanded it, and struck her; that she ran to her sister's and then to her father's; that prisoner followed her, demanding his pistol; that she had a difficulty with him and threw an axe at him; that finally she told him where his pistol was, when he left her, and the next thing she heard was that he had killed deceased. There was much evidence of prisoner's excited condition and his wild looks and his open threats to kill Young.

There was evidence on the part of the State tending to prove that prisoner had been drinking that morning; that he said he was two-thirds drunk, and that when drunk he was very rowdy. The testimony of prisoner's unusual condition came from nonexpert witnesses—his kinspeople who saw him that day before the homicide. Immediately after the homicide the insanity seems to have passed away, as he was apparently as rational as ever, and escaped to the woods, where he remained for a day, when he surrendered himself. There was evidence of previous threats made by prisoner against deceased; and there was also evidence of very friendly relations between them. Both men drank whiskey to excess. The contest between the State and the prisoner was over the defense of insanity, and both State and prisoner offered much evidence tending to support the one theory or the other.

*Attorney-General Bickett, Geo. L. Jones* and *W. C. Newland* for the State.

*Charles E. Greene* and *S. J. Ervin* for defendant.

STATE *v.* GREEN.

MANNING, J.   The record contains no exception to the re-
fusal of the trial judge to give special instructions, and no ex-
ception to his Honor's charge to the jury.   The entire charge
is included in the record, and it contains an able and elaborate
presentation of the law of the case as applicable to facts as the
jury should find them to be.   The contentions of both State and
the prisoner are stated fully and impartially.   We have, there-
fore, a verdict resting upon a charge so clear and just and able
that the learned counsel of the prisoner have not complained to
us of any error in it prejudicial to the prisoner's rights.   The
errors assigned by the prisoner are directed solely to the ad-
mission of incompetent and the rejection of competent testi-
mony.

The trial judge permitted the prisoner's wife to rehearse to
the jury, in minute detail, everything she told the prisoner about
the conduct of the deceased the night before.   The prisoner
offered to prove as a substantive and independent fact the
truth of the narrative by the wife, but this was excluded by his
Honor.   His Honor's ruling is, we think, clearly sustained by
the decision of this Court in *S. v. Banner,* 149 N. C., 519, in
which this Court held: "When the defense is a plea of insanity
and not self-defense, a witness may not testify, as tending to
show self-defense, that he had seen deceased armed, on a dark
night, at a place where the prisoner would likely pass, some two
weeks before the occurrence, though he may testify that he had
told the prisoner concerning it, and what the prisoner said and
did in consequence, only so far as it may affect the question of
insanity, and for that purpose alone."

In *People v. Wood,* 126 N. Y., 249, *Judge Peckham,* in a
learned and elaborate opinion, held that it was competent for a
defendant to offer evidence of communication made to him (in
that case, the communications offered were of a similar character
to those in this case), "for the purpose of showing an adequate
cause for the state of mind existing subsequent to the communi-
cation.   The subsequent conduct, appearance and conversation
of the person to whom the communication is made are the
proper subjects of proof, for the one purpose of showing what
effect upon him such communications had, and that it rendered
him insane within the legal definition of the term at the very
time of the commission of the deed."   The evidence was held
competent, "for the reason that all the facts are material for
the purpose of enabling the jury to say what was the condition
of mind of defendant when the deed was perpetrated."   This be-
ing the sole purpose of the evidence, the truth or falsity of the
communication is not material, and it is not competent to in-

quire into it. It is, of course, competent to challenge the fact of communication, but not its truth or falsity.

In the present case, his Honor permitted the prisoner to show in minute detail the communication to him by his wife, and his conduct, appearance, utterances and acts immediately thereafter and to the time of the homicide. This was, in our opinion, as far as it was permissible to go. There was no evidence of any disorder of the brain prior to the morning of 9 September, the day of the homicide; the evidence tended to show the prisoner to be a man possessed of an ordinarily normal mind, except occasional outbursts when intoxicated. In a few hours after the homicide, the prisoner's mind seemed to recover its balance and to resume its normal condition. It was the contention of the prisoner that the sudden "brain storm," which was so violent as to dethrone reason and make him irresponsible for his acts, was caused by his wife's communication. Of its truth or falsity he could know nothing, and could not have been influenced by such knowledge. The theory of the defense and its plea is that he believed it so strongly and so absolutely that the prisoner was made insane. If the purpose was to show the character of the deceased for violence, it was inadmissible, because it did not fall within one of the exceptions to the rule settled in this State for admitting such evidence. *S. v. Banner, supra; S. v. Turpin,* 77 N. C., 473; *S. v. Byrd,* 121 N. C., 688; *S. v. McIver,* 125 N. C., 646. In our opinion, therefore, the offered testimony of the wife that the occurrence communicated by her to the prisoner, her husband, was true as an independent and substantive fact, was properly excluded.

Nor do we think there was error in refusing to permit the prisoner's wife to give her reason for going to the house of deceased for her husband, whom she had seen, early in the morning of the homicide, go there with the deceased, and before she had communicated to him the occurrences of the night before. She testified that she saw her husband walk with the deceased to his house, that she went after him, called him out of the house, and they walked together to their home.

The prisoner objected to certain testimony offered by the State, that when drinking he was violent in speech and conduct. The State offered evidence tending to show that prisoner was "two-thirds" drunk on the morning of the homicide. The prisoner, not having been at the trial examined as a witness, offered testimony of his good character. It was competent for him to do so. *S. v. Hice,* 117 N. C., 782. This evidence offered by the State as to the effect produced upon prisoner by whiskey was directed to his plea of "transitory insanity." We cannot

see that its admission was prejudicial to the prisoner or that it was incompetent for the purpose it was offered. If the answers of some of the witnesses were not responsive, or not, in themselves, competent, the prisoner's right was to move to strike out such answers and to request his Honor to direct the jury not to consider such answers in reaching their verdict. We have carefully read the entire record and examined all the cases cited by the learned counsel of the prisoner, and we find no error committed at the trial prejudicial to the prisoner's rights. The jury of his county, who saw the witnesses and their demeanor, who heard the entire testimony, have, by their verdict, given to the sudden "brain storm" of the prisoner, created by his wife's communication, such weight and influence as to acquit the prisoner of the capital felony, but not to acquit him of all responsibility for his act. We find no error in the record, and the judgment is affirmed.

No error.