■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LUIS ARROYO, Appellant.—Appeal by defendant from a judgment of the County Court, Rockland County, rendered November 9, 1976, convicting him of criminal sale of a controlled substance in the third degree, upon a jury verdict, and imposing sentence. Judgment affirmed. No opinion. Suozzi, Cohalan and Hawkins, JJ., concur; Titone, J. P., dissents and votes to reverse the judgment and order a new trial, with the following memorandum: An issue preserved for appeal by defense counsel at the trial, although not raised in appellant's brief, is whether the failure of the prosecution to request that a witness called by the defendant be granted immunity from prosecution warrants a reversal of the conviction and the granting of a new trial. At the trial evidence was presented that Wendell Hill, a police informant, made arrangements for the Rockland County Narcotics Task Force to purchase cocaine from one John Gordon, of 5 North Oak Street, Spring Valley, New York. Gordon, who lived at that address with his parents, was 17 years old and a good friend of defendant Arroyo. The latter was 24 years of age and married. Because he needed a place to stay until he rejoined his wife, who had previously returned to Puerto Rico, defendant was living at the Gordon home at the invitation of John Gordon's mother. According to informant Wendell Hill, pursuant to arrangements made by him, the police went to Gordon's home to purchase cocaine on April 12, 1976 at about 1:00 P.M. Hill accompanied them and knocked on the door of the Gordon home. John Gordon responded but refused to sell any cocaine to them. Shortly after Hill returned to the police to tell them of Gordon's refusal, defendant came out from the Gordon house and said he would sell to only one, but not all, of the undercover officers. He then went into the house, emerged a short time later and sold six "dime" bags of cocaine to one of the officers for $50. Three undercover agents who allegedly witnessed the transaction corroborated Hill's version of the events. One of them, Wallace Zeins, also testified that on April 15, 1976, three days after the purported sale by defendant, he returned to Gordon's home with the confidential informant (Hill) and purchased seven tinfoil packets of cocaine from John Gordon. At that time defendant was on the Gordon property in the vicinity of the driveway. Gordon was arrested in his home right after that sale and defendant was arrested for the April 12 sale when he attempted to flee from the scene. In his defense, defendant testified that Hill had approached him in the presence of John Gordon on the day before the alleged sale and told him that he had some friends coming from the city who wanted to buy cocaine. Hill said he would give defendant some packages containing salt instead of cocaine so that the latter could sell them as cocaine and "rip-off" his friends. Hill offered to split the proceeds of the sale evenly with defendant, the sale price being $50 for six bags. According to Hill, his friends would not be able to "come back" to defendant because he was going to Puerto Rico. Defendant then testified that he made the sale the following day believing that the packages contained salt, as represented by Hill. However, in fact, the packages contained cocaine. The trial transcript also reveals that defendant subpoenaed John Gordon to corroborate his story. However, Gordon refused to testify as to events preceding the sale on the ground of possible self incrimination. The trial court sustained Gordon's right to assert his Fifth Amendment privilege. It also denied defense

counsel's application to have immunity from prosecution granted to Gordon for his testimony when the District Attorney refused to request such treatment in accordance with CPL 50.30. The basis for counsel's desire to have Gordon testify for defendant is a recorded statement given by Gordon on September 22, 1976 to William Frank, Chief Assistant District Attorney of Rockland County. In response to Frank's interrogation, Gordon responded substantially as follows: A day or two before the sale of cocaine for which defendant was indicted, Gordon was with defendant on Eckerson Road, the street on which informant Wendell Hill resides. He saw defendant converse with Hill and, during the conversation, observed Hill hand the former a brown packet. At the time Gordon was about five feet away from them. After placing the packet in his pocket, defendant returned to Gordon. He told Gordon that (1) Hill said the packet contained salt, (2) they were going to sell it to "guys" from New York City and should not worry about getting caught, (3) Hill would get in touch with them when he wanted to sell it and (4) defendant would receive $30, half of the proceeds of the sale. Defendant also said that he intended to go to Puerto Rico shortly and he needed the $30. Gordon told Frank that Hill called him the next day (April 12) and said that "these guys are coming over." That afternoon Hill and the "three guys" tried to get into the house. However, they left with defendant after the latter spoke to them; Gordon had instructed defendant not to let them in. Defendant returned five minutes later and told Gordon that he had completed the transaction and received $60 from Hill's "people". That evening, according to Gordon, he and defendant went to Hill's house. He saw defendant give Hill "back some bills". Gordon then said that about two days later (April 14), he and defendant again met Hill. After Hill had a conversation with defendant, they approached him. Hill asked Gordon, in defendant's presence, to sell a package containing salt to certain people from New York City and to tell them it was cocaine. Hill assured both of them that they would not "get busted for it", that they should not worry because it was only salt and that "these guys won't know where you live". On the next day, April 15, Hill telephoned Gordon and said that they should meet him. Later the same day Hill and several other men met Gordon in front of the latter's home. Gordon entered the back seat of their vehicle, gave the driver the brown packet that Hill had given him the previous day and received $70 in return. Immediately thereafter, both defendant and Gordon were arrested. I do not quarrel with the trial court's ruling which sustained Gordon's assertion of his Fifth Amendment privilege against self incrimination. To sustain the privilege, it need only be evident from the implications of the question that a responsive answer or an explanation of why it cannot be answered "might be dangerous because injurious disclosure could result" (Hoffman v United States, 341 US 479, 486-487). It is entirely conceivable herein that Gordon, questioned at the trial about events leading up to and including the purported sale of cocaine by defendant on April 12, 1976, may have implicated himself in that transaction. Moreover, I am also aware, with respect to the refusal of the prosecutor to grant Gordon immunity on behalf of the defendant, that since immunity statutes are enacted for the benefit of the prosecution, an accused ordinarily may not invoke such a statute to compel a witness to testify in his behalf (State v Perry, 246 Iowa 861; 98 CJS, Witnesses, § 439; cf. Earl v United States, 361 F2d 531, cert den 388 US 921; United States v Bautista, 509 F2d 675, 677, cert den sub nom. Monsivais v United States, 421 US 976). I am also cognizant that under the New York statute (CPL 50.30) the court is empowered to confer immunity in any criminal proceeding, other than a Grand

Jury proceeding, "only when expressly requested by the district attorney to do so." It has also been held that the purpose of an immunity statute is to aid, not defeat, the State's efforts to punish those guilty of offenses against the People (State v Archambault, 72 Mont 259, 262; State v Perry, supra). However, and to paraphrase the Court of Appeals memorandum decision in People v Tyler (40 NY2d 1065, 1066-1067), lurking in the background of this case is the difficult issue of whether a failure or refusal of the People to consent to a grant of immunity to a witness who refuses to testify under a claim of privilege against self incrimination, in consequence of which a defendant is denied exculpatory testimony, may ever constitute a denial of due process and deprivation of the defendant's constitutional right to a fair trial (see, also, People v Sapia, 41 NY2d 160). Unlike the situation in Tyler, this issue, although it was not presented on appeal, was preserved for review on appeal by defense counsel's taking timely exception at the trial (see CPL 470.05, subd 2). While I agree with the general proposition that the purpose of an immunity statute is to aid the State in prosecuting those guilty of offenses against the People, I do not believe it follows that the use of such a statute on behalf of a defendant in a given set of circumstances frustrates the sovereign in its over-all efforts to enforce its laws and to combat crime. A statutory key of the prosecutor designed to unlock doors for the purpose of shedding light on the existence of criminal activity should not be secreted when its use in a rare situation may well lead to evidence of an exculpatory nature. Justice would seem to require that immunity from prosecution based upon testimony of a witness should not be denied because such testimony would tend to exonerate a defendant in a criminal case, and be granted only when it would tend to convict a defendant (State v Broady, 41 Ohio App 2d 17). Setting aside for the moment any question as to the admissibility of testimony that Gordon could give in accordance with the statement taken from him by the prosecutor, in my opinion the refusal of the prosecutor to consent to granting him immunity deprived defendant of a fair trial in two important respects. First, Gordon's transcribed account of the incidents involving the informant Hill leading up to the sales of cocaine on April 12 (for which defendant was charged) and April 15 (for which Gordon was charged), corroborates defendant's contention that he believed the packets given him by Hill contained salt and not cocaine. Defendant's testimony in that regard may well have been believed by the jury had Gordon been allowed to testify, and if he were to have given testimony essentially dovetailing with defendant's versions of events occurring before each sale. Assuming defendant testified truthfully that he believed the packets contained salt, it is clear that he would have lacked the requisite intent to sell a controlled substance, even though he may have admitted to committing an offense for which he was not charged, to wit, the crime of larceny by false pretense (see Penal Law, § 155.05, subd 2, par [a]). Second, Gordon's assumed exculpatory testimony would also have had an important bearing on the credibility of the testimony of the informant, Hill. According to the trial transcript, Hill, a 19-year-old college student, agreed to co-operate with the Rockland County Narcotics Task Force in its undercover operations. However, his consent to co-operate with the task force did not emanate from any altruistic urge to ferret out illegal activity in the area. Rather, it stemmed from the fact that the prosecutor allowed him to plead guilty to a reduced charge in connection with his arrest for the sale of marijuana. The prosecutor also promised to intercede in his behalf at the time of sentence. Under such circumstances, an issue of fact as to Hill's motive in inculpating both defendant and Gordon was present and thus

Gordon's testimony could have had an important bearing on Hill's credibility. I am aware that there would be serious questions concerning the admissibility of Gordon's testimony in accordance with the statement given by him to the prosecutor. Specifically, I refer to Gordon's remarks to the prosecutor that defendant, after accepting the packets given him by Hill on April 11, returned to Gordon, who was five feet away, and asserted that Hill said they contained salt, and that defendant could safely sell them to the "guys" from New York as packets of cocaine since he intended to join his wife in Puerto Rico shortly thereafter. I am aware that such remark by defendant to Gordon conceivably constitutes both hearsay and a self-serving declaration and, as such, ordinarily would be inadmissible (see Richardson, Evidence [Prince-10th ed], §§ 200, 201, 357). However, with respect to the hearsay aspect, the mere utterance of a statement, without regard to its truth, may circumstantially indicate the state of mind of the hearer or the declarant, and is therefore admissible *(People v Wood,* 126 NY 249). Statements used circumstantially to indicate the speaker's knowledge, reason, belief, intent, emotion or other state or condition of mind, have even been held not to constitute hearsay (Richardson, Evidence [Prince-10th ed], § 205). In the instant situation, I am of the opinion that defendant's purportedly spontaneous statement to Gordon immediately after Hill gave him the packets supposedly containing salt, satisfies the "state of mind" exception to the hearsay rule. In a similar vein, I believe that although it was self-serving, defendant's alleged declaration to Gordon immediately after receiving the packets from Hill, indicating a belief that they contained salt, would be admissible as part of the *res gestae* (see *People v Kehoe,* 253 App Div 762, affd 278 NY 518; Richardson, Evidence [Prince-10th ed], § 359). Thus, I am of the opinion that in this instance the People should either consent to a grant of immunity to Gordon at a new trial or, alternately, consent to a dismissal of the indictment (see *Roviaro v United States,* 353 US 53, 61; see, also, the discussion in that regard in *People v Sapia,* 41 NY2d 160, 166, *supra).* To me it is fundamentally unfair for the prosecution to reserve use of the immunity statute for its own benefit and refuse to employ it when its use would tend to have exculpatory testimony elicited for the defendant (cf. *Wardius v Oregon,* 412 US 470). Accordingly, I believe that the judgment should be reversed and a new trial ordered.