## YODER v. UNITED STATES.
### No. 1246.

Circuit Court of Appeals, Tenth Circuit.

Dec. 9, 1935.

F. H. Reily and Joe H. Reily, both of Shawnee, Okl., for appellant.

William C. Lewis, U. S. Atty., and F. M. Dudley, Asst. U. S. Atty., both of Oklahoma City, Okl.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

The sordid story of the joint adventure in immorality forming the basis for this prosecution by the United States government need only be sketched here, for upon the first appeal [(C.C.A.) 71 F.(2d) 85], the facts are stated fully. There are some discrepancies. On both trials the prosecuting witness testified she was 18 at the time of the transportation; at the first trial it appeared she was 20, and upon this trial 22. In 1933 she testified "I have been married four years" and on this trial testified she had been married four years in 1931. Then she testified "We were going to Chicago to try to buy a garage"; now she testifies that "they went to Chicago for the purpose of getting divorces and getting married." In this trial, proof of the effort to exact $1700 from appellant's father in consideration of not prosecuting this case, was not offered. Nor was the testimony offered this time that she had testified in the state court that "she did not go to Chicago with Roy Yoder for any immoral purpose."

But the differences do not warrant detailing the proof again. It suffices now to narrate that Sammy Young was married to a man more than twice her age. She met Yoder at his garage and cultivated the acquaintance although both were married and she knew it; she testified that on her first clandestine meeting with appellant "we drove around and we would talk, and I told him I was not satisfied with my husband. He knew my husband was old for me and everything, oh, I don't know." Within a surprisingly short time—on the first trial she said a week or more, now she says two or three weeks—they were having illicit relations frequently. She testifies that they agreed to go to Chicago for the primary purpose of getting divorces and marrying, and incidentally to buy a garage. She drove her car to his garage, picked him up, and in her car drove to Chicago, having intercourse at all stops, stayed a day and came back home. This prosecution followed an unsuccessful effort to get money from him or his father. After a verdict of guilty, appellant was sentenced to three years in the penitentiary. Two principal errors are assigned.

1. One concerns the admissibility against Yoder of testimony of his divorced wife. Yoder testified that he and Mrs. Young left for Chicago from his home, and that both of them talked to Yoder's wife about the trip. In rebuttal, the government called Mrs. Yoder, who had divorced Yoder after the Chicago trip and before the trial, and over seasonable objection and exception, she testified that she was not home the day her husband and Mrs. Young left for Chicago; that she was in Seminole; that she did not know Mrs. Young; that when she returned from Seminole, she found a note from her husband, written on a large cardboard, that he had gone to Blackwell; that after the divorce Yoder asked her to corroborate his testimony by false swearing.

We are of the opinion that this testimony was rightly admitted. Until 1933, spouses were incompetent witnesses in criminal trials in the federal courts. But in that year, in Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, 93 A.L.R. 1136, the subject of evidence in criminal cases was exhaustively reviewed, and the court held that the rules of evidence were not restricted to the local rules in force at the time of the admission into the Union of the state where the trial took place, but were governed by common law principles as interpreted by the federal courts in the light of reason and experience. It was there held that a wife is a competent witness for her husband. Whether she is a competent witness against him was reserved, and has not been authoritatively decided.

From the dawn of the common law until the middle of the nineteenth century, the accused could not testify in his own behalf because of his interest in the event of the trial. The rule had its roots in the era when no witnesses were called in any jury trial, unless the jury or the court sought their testimony to supplement their own information; after witnesses were admitted in civil cases, the accused was not permitted to call witnesses in his own behalf until the seventeenth century; and for nearly two centuries after that, the accused was disqualified as a witness. But the common law has lived because it is not chained to the traditions and dogmas of the past. Learned writers and judges long ago challenged the policy of rigid rules that denied access to the facts. Courts and juries, searching for the truth, chafed under a system which denied the accused an opportunity to tell his story. But not until 1864 was the rule abrogated in any state in this country (chapter 280, Me.Stat. 1864); in 1878 Congress removed the bar of incompetency (20 Stat. 30, 28 U.S. C.A. § 632), and in 1898 England followed suit. The accused is now a competent witness in his own behalf in every state save possibly one.

By similar statutes every state but one permits a wife or husband to testify when the other is accused, sometimes only in his behalf or with his or her consent. Notwithstanding that a wife has a lesser interest in the outcome than the accused, Congress passed no statute removing the bar as to her, but as has been seen the ancient rule was abrogated by judicial decision. A wife is now competent to testify for her accused husband; the question still remains, May she testify against him? In this case, she was divorced when she testified, and there may well be a distinction on that ground. We prefer, however, to rest our decision on the underlying question, whether a wife is incompetent as a witness when called by the prosecution.

The accused himself, by the federal constitution and the constitution or laws of the states, may not be compelled to testify

upon his own trial. Should that immunity extend to his wife? The enlightenment of the times which requires modification of common law principles may be found in the informed judgment of legislatures or the courts. Funk v. United States, supra. An analysis of the statutes of the various states and territories, compiled by Dean Wigmore in 1923 (Wigmore on Evidence, § 488) indicates that the wife is a competent witness with his consent in 18 states; competent, but not compelled to testify, in 4; competent for the defense in 5. In these states, and in 3 others where otherwise incompetent, she may testify against her husband, without his consent, where certain crimes, such as assault upon her, are involved. In 20 states, all restrictions on her competency have been removed.

■ These statutes, and the decisions of many courts which might be cited, indicate a clear and decided trend toward removing the bar of incompetency from witnesses as such; that we are moving steadily in the direction of allowing the trier of the facts to hear all the evidence, the interest or relationship of the witness to the parties being given due consideration in weighing its value. The trend is in the right direction, for we can see no reason why Mrs. Yoder should not testify that she was in Seminole, and not Shawnee, on a certain day, and that she did not know Mrs. Young; nor can we see any reason why Yoder, who testified to the contrary, should have the privilege of excluding her testimony.

■ Her testimony of communications between her and Yoder after the divorce are not privileged, because they were not then husband and wife. Mrs. Yoder's testimony, however, did not stop there. She testified to a written communication between her and her husband during their marriage. Competency of this testimony involves very different considerations from those concerning her competency as a witness. The wisdom of the common law rules that held inviolate the confidence of a penitent in his priest, a patient in his physician, a client in his lawyer, and a husband in his wife, has stood the test of time. The statutes of forty-two jurisdictions provide that private communications between husband and wife are incompetent evidence, and in twenty-six of these it is expressly provided that they are incompetent during the marriage and afterward. Such is the rule in the federal courts. Hopkins v. Grimshaw, 165 U. S. 342, 17 S.Ct. 401, 41 L.Ed. 739.

Mrs. Yoder testified that her husband left a note for her, written on a large cardboard and doubtless in a conspicuous place, telling her he was in Blackwell. Is this communication confidential and privileged?

The question is, we think, authoritatively decided in Wolfle v. United States, 291 U.S. 7, 54 S.Ct. 279, 280, 78 L.Ed. 617. There a letter to a wife, dictated and testified to by a stenographer, was held admissible, reserving however the question whether the wife could have identified it. The following excerpts from the opinion bear directly upon the case at bar:

"Communications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged; but, wherever a communication, because of its nature or the circumstances under which it was made, was obviously not intended to be confidential, it is not a privileged communication. * * * The privilege suppresses relevant testimony, and should be allowed only when it is plain that marital confidence cannot otherwise reasonably be preserved."

■ When it is sought to elicit a communication between husband and wife, not made in the presence of others, it should be excluded unless it appears to the court, either from the method or the nature of the communication, that obviously it was not intended to be confidential. Both the method and the nature of this communication demonstrate that there was nothing confidential about it. We think the court rightly admitted it in evidence.

■ 2. Error is assigned to the court's charge. The statute condemns the interstate transportation of a woman "for the purpose of prostitution or debauchery, or for any other immoral purpose." 18 U.S. C.A. § 398. The indictment charges Yoder with such transportation "with the intent and for an immoral purpose." Distinct offenses are defined in two clauses of this statute. Gillette v. United States (C.C. A.8) 236 F. 215. The clause of the statute under which this indictment is drawn does not use the word "intent," so that word in this indictment is surplusage.

■ The sharp issue at the trial was the purpose of the Chicago trip, for there was

no dispute about immoral practices en route to Chicago and while there. Mrs. Young testified that the purpose of the trip was to get divorces from their respective spouses, living in concubinage the while; incidental to that purpose, she said Yoder wanted to buy a garage in Chicago. Yoder testified that Mrs. Young employed him to go to Chicago to inspect a garage she thought of buying, and agreed to bear all expenses of the trip and pay him for his time; that he understood first that her husband would accompany them, and later that he would meet them the first night out in Joplin. The husband not appearing in Joplin, Yoder took his place. Five witnesses, one a Justice of the Peace, one a former assistant chief of police, and all apparently disinterested, testified that they heard Mrs. Young employ Yoder to make the trip. Yoder, like Mrs. Young, was impeached; nevertheless, he was entitled to have his defense submitted to the jury. King v. United States (C.C.A.10) 55 F.(2d) 1058; Bogileno v. United States (C.C.A.10) 38 F.(2d) 584.

The issue, then, was a simple one. What was the purpose of the trip? Was it the immoral purpose charged in the indictment and testified to by Mrs. Young, or did Mrs. Young employ Yoder to make the trip to inspect a garage? Did he take her for an immoral purpose, or did she take him for a business reason?

In one part of his charge, the court correctly submitted this simple issue in this language:

"It is the contention of the government that prior to the 28th day of September, 1931, covering a period of several months, the defendant and Sammy Lee Young had engaged at different times in sexual intercourse, and that the defendant suggested that they take a trip to Chicago; that both being married, after they arrived at Chicago they would secure divorces there from their respective spouses, and thereafter would marry each other and live in Chicago, and that the sole purpose in going to Chicago was in order that they might live together and engage in these immoral relations. The burden of proof is upon the government, however, to establish its theory by competent evidence beyond a reasonable doubt."

But the court did not stop there. Instead, he told the jury that even if she employed him to make the trip to inspect a garage, still he would be guilty if when the trip started he intended to have carnal intercourse with her. The court said:

"If you further find from the evidence beyond a reasonable doubt that the defendant entered into an agreement with the said Sammy Lee Young whereby she agreed to pay the defendant the sum of five dollars per day and his expenses to drive her to Chicago, and at the same time the defendant had a definite or fixed intention to have sexual relations with the said Sammy Lee Young after reaching a foreign state, and after reaching a foreign state the defendant did have sexual relations with the said Sammy Lee Young as originally intended on his part, then and in that event the defendant would be guilty and you should so find, regardless of the fact that he was being paid a per diem and expenses for so transporting her."

Again, after setting out the theories of the government and the defense, the court said:

"but notwithstanding the two theories of the plaintiff and the defendant, as hereinbefore stated, the sole question for you to determine is that of the defendant's intent before leaving the State of Oklahoma."

The jury was then advised as to defendant's contention that he agreed to go to Chicago, for a consideration, to inspect a garage; as to that, the court charged:

"If you find from the evidence in this case that this agreement was the sole motive which prompted the defendant to take this trip to Chicago, and that at no time prior to the time he left the State of Oklahoma, he had any intent or plan to engage in immoral or sexual relations with the said Sammy Lee Young and that he had no such intention or purpose to engage in sexual relations with her in any state outside of Oklahoma, until after he left the State of Oklahoma, that would constitute a valid defense, and if there is a reasonable doubt in your minds as to whether or not the defendant did have an intent to engage in immoral relations with Sammy Lee Young outside of the State of Oklahoma, until after he left the State of Oklahoma, your verdict should be for the defendant."

The assignment of error directed at the charge is well taken. If the jury believed that the parties were intimate in Shawnee, and that the defendant intended other intimacies while on this trip, they were bound by this charge to convict, even

though they believed that she transported him in her own car, at her own expense, solely for a business purpose, and that the idea of intercourse did not figure at all in the reasons for the trip.

The court's charge substituted for the "purpose" condemned by the statute the "intent" of defendant. An examination of the dictionaries helps but little in ascertaining the meaning of these words, for each has its shades which merge one into the other. In ordinary use, "purpose" means the motive for an act, the intention which prompted it, and without which it would not have occurred. "Purpose" is an intent that motivates. Action is had because of one or more purposes; accompanying the purpose are intentions which are purely incidental and which exert no influence on the action. Counsel go from Oklahoma City to Denver to argue a case; when they leave, they have a fixed intention to ride on the train, to eat, and to sleep. Yet no one would say the purpose of the trip was to eat. The substitution of the "intent" used in the charge for the "purpose" of the statute ignored the element of motivation in the word "purpose," and by so doing, stripped the defendant of his defense.

█ If the charge had followed the statute, the jury might well have believed that the purpose of the trip was legitimate employment, and that any idea of sexual relations was as subsidiary and as unrelated to the reasons for the trip as eating and sleeping en route. Not only did six witnesses, five disinterested, testify directly as to the purpose of the trip, but the jury's common sense might have suggested that, on Mrs. Young's own testimony, it was quite unnecessary to go to Chicago or anywhere else for sexual reasons. In the ordinary use of language, it cannot fairly be said that Yoder transported Mrs. Young for an immoral purpose, if the only reason which prompted him to make the trip was to earn mechanic's wages, simply because he intended to continue his relations with her while on the trip.

The government charged what the statute condemns, an interstate transportation for an immoral purpose. The government offered proof of such purpose. The defendant offered evidence that the trip was made for an entirely different purpose—a business reason. The jury should have been left to decide the issue. Instead the court charged in substance that whatever may have been the reason that brought about the trip, there must be a conviction if Yoder intended to have sexual commerce with her while away. No matter how vagrant and fleeting that intent, no matter that it did not influence in the slightest degree the decision to make the trip, still, the court charged, there must be a conviction if Yoder harbored the intent to continue his relations with her. This is substantial error.

The authorities support this view. In Van Pelt v. United States (C.C.A.4) 240 F. 346, 349, L.R.A.1917E, 1135, the defendant had been intimate with a woman for years; she became enceinte and he took her to another state for her confinement, intending to and continuing his relations with her there. It was held that such proof would not sustain the conviction, the court, speaking through Judge Rose, saying:

"Before the defendant could properly be convicted, there must be evidence that the purpose, or one of the purposes, of the defendant, if he had more than one, in bringing the prosecutrix to Baltimore, was that he might have sexual intercourse with her. No possible reason is suggested by the record why he should have gone to the trouble and expense of having her make such a trip, and making it with her, merely in order that he might twice more exercise a liberty which he had taken hundreds of times before, and could just as well have taken an indefinite number of times more, if she had remained at home. * * * But, upon the undisputed evidence in this case, there can be no doubt that the girl was brought to Baltimore in order that she might go into seclusion during the later months of her pregnancy and have care during her confinement. The defendant may have anticipated that while on the journey he would gratify his desire, as he doubtless would have done, had the trip never been taken; but there is no evidence from which it can reasonably be held that such anticipation played any part whatever in inducing him to arrange for her coming to Baltimore."

In Sloan v. United States (C.C.A.8) 287 F. 91, 93, defendant had been intimate with a woman for some time; he took her to visit her sister in another state, and stayed all night with her at a hotel in the other state. Undoubtedly he. "intended" that which he did, but the court set aside the conviction because

there was no proof that the prospect of sexual intercourse had anything to do with the trip. The court said:

"There can be no doubt that the sole object of taking the trip from Shafter to St. Louis was to enable her to visit her sister and to try to obtain employment in a store, as she had been employed some months before. There is nothing in the evidence to show any possible reason why he should have gone to the trouble and expense of taking her to St. Louis, merely in order that he might have illicit intercourse with her, when he could have done so at home, without taking her to another state, as she testified that she had frequently had such intercourse with him in the state of Illinois, and later took a trip with him from Shafter to Chicago, in the state of Illinois, for the immoral purpose."

In Thorn v. United States (C.C.A.8) 278 F. 932, the woman was enciente and defendant took her to another state for her confinement, in which state they lived together as husband and wife. The court, in an opinion by Judge Cotteral, held the proof insufficient.

In Welsch v. United States (C.C.A.4) 220 F. 764, 769, defendant's intimacy with the prosecutrix had been long continued; after an interstate trip made for another purpose, the intimacy continued. The court held:

"It appears to us an untenable proposition, when this girl went back home for a legitimate and commendable reason, because of information coming to her which was of itself ample cause and explanation of her return, that the defendant can be held to have committed the offense of which he was found guilty merely because he might have had the secret desire or intention of using her there for the gratification of his passion, although he had nothing whatever to do with her going back which was not entirely suitable and proper."

In Fisher v. United States (C.C.A.4) 266 F. 667, 670, dealing with a somewhat similar situation, the court said:

"That is to say, the interstate transportation denounced by the act must have for its object, or be a means of effecting, or at least of facilitating, the sexual intercourse of the parties. But the mere fact that a journey from one state to another is followed by such intercourse, when the journey was not for that purpose, but wholly for other reasons, to which intercourse was not related, cannot be regarded as a violation of the statute."

In Hunter v. United States (C.C.A.4) 45 F.(2d) 55, 56, 73 A.L.R. 870, defendant and the prosecutrix had lived together as man and wife in several states. He sent her on a journey to her mother in another state, followed her there and resumed the relations. The court held the transportation was unrelated to the intercourse, for their relationship could have continued "undisturbed, indefinitely and anywhere," and a trip for that purpose was an unnecessary trouble. The doctrine of Fisher v. United States, supra, was followed.

In Biggerstaff v. United States (C.C.A.8) 260 F. 926, 928, the court said:

"The mere fact that an immoral act was committed on an interstate journey does not of itself constitute that essential element of the offense. * * * The evidence in this case is so exceptionally coarse and revolting that it will not be discussed in detail. Upon a most careful consideration of it, giving to the verdict of the jury the full credit to which it is entitled, we are of the opinion that there was not sufficient proof of a purpose of the interstate transportation that brings it within the statute. That there was another purpose, lawful, insistent, and pressing, was admitted. It was openly declared and understood by all concerned. It was plain that some one had to accompany the woman on the first part of her journey, from her home to the nearest railroad town, and the accused was naturally the person to go. He was not a volunteer. To say that the journey was undertaken by him with the intention of creating an opportunity within the statute is, we think, pure speculation."

In Smith v. United States (C.C.A.4) 281 F. 696, 699, it was discovered after the trial that the woman had planned the trip before the defendant proposed to pay her way and accompany her. On the trip, there was sexual indulgence. The court held a new trial should have been granted, saying:

"This after-discovered evidence as to what had occurred some two days before the time the defendant was brought into the matter, as testified to by Mrs. Self, is to the effect that she had at that time already planned for the trip for a legitimate purpose, with which the defendant

was in no manner connected. The value to the accused of this after-discovered evidence cannot well be over-estimated, and the importance of the time of making the arrangement, as set forth in the affidavits, becomes only too apparent."

And in Alpert v. United States (C.C.A. 2) 12 F.(2d) 352, 354, the court said:

"The fact that a journey from one state to another is followed by such intercourse, where the journey was not for that purpose, but wholly for other reasons, cannot be regarded as a violation of that act."

The Supreme Court of the United States said in Caminetti v. United States, 242 U.S. 470, 491, 37 S.Ct. 192, 197, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas. 1917B, 1168:

"It may be conceded, for the purpose of the argument, that Congress has no power to punish one who travels in interstate commerce merely because he has the intention of committing an illegal or immoral act at the conclusion of the journey. But this act is not concerned with such instances. It seeks to reach and punish the movement in interstate commerce of women and girls with a view to the accomplishment of the unlawful purposes prohibited."

■ While "intent and purpose" are used synonymously in the second clause of this statute, and many courts have so used them in these cases, yet the authorities cited all hold, as we do, that the prospect of sexual relations must have some relation to, and be one of the reasons or purposes of the trip. There may, of course, be two or more purposes for one trip, Carey v. United States (C.C.A.8) 265 F. 515, but if the sole purpose of the trip is legitimate, a purely incidental intent to have intercourse is not a federal offense. If the jury believed the witnesses for the defendant here, there was no crime. And their testimony is strongly buttressed by the admitted fact that there was no necessity to go to Chicago, or anywhere else, for an immoral purpose.

■ Complaint is made that in stating defendant's contention, the court shifted the burden of proof from the government. The court did, doubtless inadvertently, say to the jury that if they found defendant's contention to be true "beyond a reasonable doubt," etc. There is no such burden on defendant. There must be an acquittal if the jury, after considering the conten-

tions of both sides, fails to find the government's contention to be sustained beyond a reasonable doubt. If the case is tried again, the danger of misunderstanding can be avoided, for the question is simple. Mrs. Young testified to one purpose; defendant and his witnesses to another. Unless the jury believes beyond a reasonable doubt that the purpose of the trip was as testified to by Mrs. Young, they should acquit.

The judgment of conviction is reversed and the cause remanded.

Reversed and remanded.