## LONG v. UNITED STATES.
### No. 3401.

Circuit Court of Appeals, Tenth Circuit.
March 5, 1947.

Rehearing Denied March 27, 1947.

Donald C. Allen, of Wichita, Kan., for appellant.

Haskel Pugh, of Anadarko, Okl. (Charles E. Dierker and Robert E. Shelton, both of Oklahoma City, Okl., on the brief), for appellee.

Before BRATTON, HUXMAN, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

The appellant, Charles Webb Long, was indicted with Alfred Ralph Gibson in two counts in the United States District Court for the Western District of Oklahoma. One count charged that on or about the 24th day of April, 1946, the defendants transported and aided in the transportation of one Rama Lou House, a girl twelve years of age, from Wichita, Kansas, to Medford, Oklahoma, with the intent and purpose that she would engage in debauchery and other immoral practices, in violation of Section 398, Title 18 U.S.C.A., 36 Stat. 825. The other count charged the defendants with a conspiracy to commit the same offense. A jury having been waived, the trial court found both defendants guilty as charged in the indictment. Long was sentenced to probation on the conspiracy count, and to eighteen months in the custody of the Attorney General on the other count. Gibson has not appealed, and the record does not show the disposition of the case as to him. Long prosecutes this appeal, contending primarily that the evidence is wholly insufficient to support the finding of guilt on either count.

The evidence fairly shows that Mary Lou Stephenson, thirty-five years old, had been married three times and had five children, the oldest of which was Rama Lou House, age twelve, and the youngest fourteen months. She was living in Wichi-

HUXMAN, Circuit Judge, dissenting.

ta, Kansas, without benefit of husband, and the defendants Long and Gibson were staying at her home. She was operating a night club, and Long was employed as a guard there. He had previously loaned her some money and claimed to be in love with her. It seems that complaints had been made concerning the delinquency of the children, and the juvenile authorities had threatened to take them away from her. On at least one other occasion, Long had transported Rama Lou and the baby to Blackwell, Oklahoma, at the request of the mother. On the evening of April 24, 1946, Long told Mary Lou that he had heard around the courthouse that the children were going to be taken away from her, and she determined to get them out of town that night. Long borrowed an automobile from his mother, and preparations were made to take the children to Oklahoma. It was decided that Long would take the children to Wellington, Kansas, approximately twenty miles south of Wichita, that night, and there wait until the mother could join them the next day for the journey southward to Oklahoma. She gave Long about $3.50, and he left with Alfred Gibson and the children at eight-thirty in the evening.

The party did not stop at Wellington, but took a circuitous route around the town, keeping on the country roads. When they arrived at the port of entry into Oklahoma, they decided not to attempt to cross the state line, but to go around by way of a country road. The car was ditched and they spent the night in the car; were pulled out the next morning and crossed the state line at the port of entry. Rama Lou testified that at the port of entry, and before crossing the state line, Long said to Gibson, "You know the Mann Act charge against carrying someone across the line. You better marry her when you get across." After they crossed the state line, Gibson borrowed some money from his people near Renfrow, Oklahoma, bought a quart of whiskey, and drank most of it. Long attempted to call Mary Lou from Renfrow, but being unable to contact her by telephone, the party continued to Medford, Oklahoma, where they stopped for breakfast. Gibson caused a blood test to be made of himself and Rama Lou for the purpose of obtaining a marriage license in Oklahoma, and he told Rama Lou that they were going to get married.

Later in the day, the party registered at the Franklin Hotel in Medford. Rama Lou testified that appellant registered her as his sister. This he denied, but it is a fact that the party occupied a room at the hotel until Gibson suggested that Rama Lou register in another room as his wife. Long protested, but Gibson persisted, and at his direction the girl registered in the name of Mr. and Mrs. Gibson. When she returned to the room occupied by the party, Gibson told her to go to the other room with him, and appellant then took the baby. Gibson and the girl did go to the other room, and he there attempted to have sexual intercourse with her. Later, the girl asked appellant Long if he knew what Gibson had tried to do, and he answered, "Yes, I sure do." Thereafter appellant called Mary Lou on the telephone and told her that Gibson and the girl had gotten married, whereupon Mary Lou communicated with officers in Wichita, who accompanied her to Medford, arriving at about three o'clock in the morning. Gibson, the girl Rama Lou, and the baby, were found in one room, and appellant and the other children in the other room. When Rama Lou was asked if Long made any improper advances to her during the trip, she replied, "No, but he was the one who got Al to do it. * * * He kept telling Al he would have to marry me on account of the Mann Act before crossing the line"; that when she asked if they were going to stop in Wellington, appellant informed her that they were not.

The Mann Act is directed at those who knowingly transport in interstate commerce "any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, * * *". See Section 2 of the Act, supra. Thus the interstate transportation must be for immoral purposes in order to constitute an offense. Yoder v. United States, 10 Cir., 80 F.2d 665. And the immoral purpose "must be found to exist before the conclusion of the

interstate journey and must be the dominant motive of such interstate movement. * * * Without that necessary intention and motivation, immoral conduct during or following the journey is insufficient to subject the transporter to the penalties of the Act." Mortensen v. United States, 322 U. S., 369, 374, 64 S.Ct. 1037, 1040, 88 L.Ed. 1331. If the sole purpose of the interstate journey is legitimate, a purely incidental intent to have intercourse en route is not a federal offense. Caminetti v. United States, 242 U.S. 470, 491, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas.1917B, 1168. See also Yoder v. United States, supra, and cases cited. There may, however, be two or more purposes of one trip—one perfectly legitimate, the other unlawful. If one of the dominate purposes of the interstate transportation is to engage in immoral practices it is a violation of the Act even though there may also have been a legitimate purpose. Caminetti v. United States, supra; Carey v. United States, 8 Cir., 265 F. 515; Simon v. United States, 4 Cir., 145 F.2d 345.

■ It seems fairly conclusive that as far as the appellant is concerned, the original purpose of the interstate journey was to remove the girl and the other children out of the jurisdiction of the juvenile authorities in Wichita, Kansas. The trip was undertaken at the request of the mother; appellant did not molest the girl in any way, and there is nothing from which it can be inferred that the trip had for its original object the effectuation or the facilitation of an immoral purpose. But although the original object and purpose of the journey may have been perfectly lawful, yet the parties could have formed an unlawful purpose while en route and before they crossed the state line. If the evidence justifies the conclusion that they did so, and that the interstate transportation from that point had for one of its objects the accomplishment of that purpose, the finding of guilt must stand.

It is fairly plain from the evidence that when the parties left Wichita it was agreed that they would travel to Wellington, Kansas, and there wait the arrival of the mother the next day. Appellant had only $3.50 with him to care for himself, the automobile and five children. Gibson's purpose in making the trip is not plain, except the suggestion that he was fleeing from the law. The party did not remain in Wellington as planned; they proceeded to the state line, but decided not to cross. They spent the night in the automobile, and the next morning when they arrived at or near the state line, they discussed the necessity for marrying the twelve year old girl in order to avoid the consequences of transporting her across the state line.

■ It is said that the only evidence from which the court could infer that Long had guilty knowledge of Gibson's unlawful purpose is the fragile testimony of the twelve year old girl concerning the conversation between the parties and Long's statements to her. It is, however, an undisputed fact that when they arrived in Medford, Gibson took the girl to a doctor for a blood test, a prerequisite to marriage in Oklahoma. It is also an established fact that they registered at the hotel, and that Gibson did attempt to have immoral relations with her. These facts and circumstances tend to substantiate the testimony of the girl that they had discussed the subject before they crossed the state line, and that Long did transport or assist in the transportation of the girl with full knowledge that Gibson purposed to have, or would attempt to have, immoral relations with her. Furthermore, the conduct of the parties at the end of the journey is evidence of its purpose, and the trial court was warranted in considering such facts in the determination of their guilt. Womble v. United States, 9 Cir., 146 F.2d 263; Brent v. United States, 5 Cir., 131 F.2d 861; Kelly v. United States, 9 Cir., 297 F. 212.

■■ To be sure, the appellant testified to facts which, if believed, explained all of his acts and exculpated him from any wrongful purpose so far as the offense charged is concerned. But it was the function of the trial court to determine whether the appellant transported or assisted in the transportation of the girl across the state line in order to make possible, or to facili-

tate Gibson's wrongful purpose; or whether the appellant and Gibson entered into a conspiracy before crossing the state line into Oklahoma to induce or compel the girl to have intercourse with Gibson. These are questions which lie in the realm of fact, of which the trial court is the first and best judge. It was the function and province of the trial court to observe the witnesses on the witness stand, and their conduct and demeanor while testifying; appraise their credibility, weigh the evidence, and resolve the conflicts and circumstances. It is not the function of this court on appeal to weigh the evidence and resolve conflicts. Our duty is limited to a determination whether the findings of guilt are supported by the evidence. Rogers v. United States, 10 Cir., 129 F.2d 843. In these circumstances, we cannot say that the trial court was not warranted in finding that at least one of the purposes of the interstate transportation was to engage in conduct outlawed by the Act.

█ █ The appellant also complains of the refusal of the trial court to grant him a separate trial, and of the latitude allowed the District Attorney in the examination of Rama Lou. It is of course true, as the appellant admits, that generally the trial court has a wide discretion in the matter of granting separate trials for defendants jointly charged. Waldeck v. United States, 7 Cir., 2 F.2d 243; United States v. Cohen, 2 Cir., 124 F.2d 164. Here the case was tried to the court without a jury, and there is nothing in this record to show that appellant was in any way prejudiced by the consideration of his guilt along with his codefendant upon the same testimony.

█ █ The trial court did allow the United States Attorney a rather wide latitude in the examination of the witness, Rama Lou, but in view of her tender years, her sex, and the nature of the case, the matter rested in the sound discretion of the court, and no abuse of that discretion is shown on this record.

The judgment is affirmed.

HUXMAN, Circuit Judge (dissenting).

The only question in this case is whether the judgment of the trial court is sustained by the required quantum of proof. Ordinarily I would not dissent when the only question was whether the judgment was sustained by the facts, even though I found myself somewhat at variance with my associates as to the analysis of the evidence. But this is a criminal case—one in which a person's liberty is involved—and thus one in which the quantum of evidence necessary to support the judgment is much greater than in civil cases.

When I review the entire record, I am unable to bring myself to the conclusion that the record justifies the conviction of the appellant. The government's entire case rests upon the uncorroborated testimony of Rama Lou, aged twelve years. Her reputation as a juvenile delinquent was bad. Although only 12 years of age, she had been pregnant at a previous time. She testified with a glibness and callousness concerning the Mann Act that one would expect to find only in a hardened inmate of a bawdy house. Here is what she said concerning the purported conversation between Long and Gibson, overheard by a mere child, before they reached the state line. She said that Long said to Gibson, "You know the Mann Act charge against carrying someone across the line. You better marry her when you get across." Just like that—a twelve-year old child repeating with precision the exact words necessary to make a case under the Mann Act. One who had studied the Mann Act and all the decisions thereunder could not state it more exactly than she did. If this conversation did take place, she could not have remembered the exact words, including the words "Mann Act." Remove this statement from the case and you have not a single peg on which to hang the judgment of the court.

Neither can I agree that the fact that Gibson took this girl to a doctor for a blood test, or that he attempted to have immoral relations with her in the hotel room corroborates her testimony as to the conversation to which she testified between Long and Gibson concerning a violation of the law, before they crossed the state line. It is not claimed that Long knew that Gibson and the girl were going to have the blood test made. When they returned they

told him they were married. If they were married, the natural thing for them to do would be to occupy a room together. How, then, these two circumstances tended to corroborate her testimony as to the alleged conversation at the state line, or how they can be construed as tending to establish that Long entered into an arrangement with Gibson to aid him in transporting this girl across the state line for the purpose of violating the Mann Act is beyond my power of comprehension.

To state, as the majority opinion does, that it seems fairly conclusive that as far as Long was concerned the original purpose of Long was to remove the children from the jurisdiction of the juvenile authorities of Sedgwick County is an understatement. It not only appears fairly conclusive but absolutely conclusive that such was the purpose of the trip. The mother testified that Long started out with the children at her request. I cannot agree that it is fairly plain from the evidence that it was agreed that the parties should stop at Wellington. The mother testified that such was the agreement, while Long testified just as positively that the agreement was that they were to go to Edmond, Oklahoma, and await the mother's arrival there.

Long's every act on the whole journey, except the fantastic conversation ascribed to him by this twelve-year old delinquent, is consistent with innocence and inconsistent with guilt. The next morning after leaving, when they arrived in Renfrow, Oklahoma, and while supposedly being engaged in assisting Gibson in transporting this girl across the state line for immoral purposes, and before such purpose had been accomplished, Long called the mother by long distance and informed her where they were, and that they were going to Edmond, Oklahoma, as planned. While she ultimately denied talking to him, at first she admitted that she did talk to him about the time this call was put through. The records of the telephone company show that such a call was put through, as testified to by Long, and that the conversation lasted for four minutes. When informed by Gibson at Medford that he and Rama Lou were married, Long immediately tried to call the mother by long distance phone. He had difficulty getting through, but when he finally contacted her, late at night, he told her, according to her own testimony, that they were in Medford, that Gibson and Rama Lou were married and were in a room together. These repeated efforts to get through and the telephone conversation are again verified by the records of the telephone company. According to the mother's own testimony, when she got to Medford she asked Long what he meant, and he replied, "I couldn't do anything about it." The sheriff of Sedgwick County, who went to Medford with the mother, testified that he and the sheriff from Medford went to the room occupied by Rama Lou and Gibson; that they asked her if they were married and that she replied that they were; that they asked her how old she was, to which she replied that she was eighteen. The sheriff further testified that the mother's reputation for truth and veracity was bad. George L. Hodges, a private detective of Wichita, Kansas, also testified that the mother's reputation for truth and veracity and being a law-abiding citizen "is very bad." Mary A. Smith, a probation officer of Wichita, Kansas, also testified that the mother's reputation for truth and veracity and for being a law-abiding citizen "is rather questionable."

Let us look at some of the other facts in the case. Long was in love with the mother. He was staying at her place and was night watchman at her night club. When she was sick, he cooked her meals and waited on her. When she was in the hospital he visited her. When she was without funds, he loaned her $170, which she has never repaid. When she wanted him to spirit her children out of the state, he meekly did so. When she wanted them returned, he obediently went after them. On none of these occasions did he ever attempt to mistreat this girl. Neither did he attempt to mistreat her on this occasion. But the government would have us believe that, notwithstanding all this, he aided and assisted another in mistreating the girl of the woman with whom he was in love, and whose children he was taking away at the time at her request. He was a veteran of the Second World War. He had served

712

his country in the war. He had never been arrested, prosecuted or convicted of a single offense against either the state or the federal government. On this occasion he started out on a lawful mission, at least as far as the Mann Act was concerned, at the request of the mother. But somewhere along the way, the government would have us believe, he agreed to assist Gibson in violating the Mann Act by helping Gibson take this girl across the state line for immoral purposes, and that while Gibson, with his knowledge and consent, was engaged in an attempt to consummate the crime, he was dutifully engaged in another room in looking after the four remaining children of this woman, including changing the diapers of the fourteen months old baby.

If these facts are sufficient to establish the charge of White Slavery against Long, this case no doubt will go down as the most fantastic White Slave case of all times. In view of this sketchy and, to me, unreliable testimony by this twelve-year old delinquent girl, and in light of the entire record, I am not content to rest the decision on the well known grounds that we are not the trier of the facts and that our function is limited to a determination whether the findings of guilt are supported by the evidence. In my view they are not so supported, and I must therefore respectfully dissent.