The People of the State of New York, Respondent, *v.* Thomas McCormack, Appellant.

First Department, April 24, 1951.

*Joseph F. Clements* for appellant.

*Charles W. Manning* of counsel (*Richard G. Denzer* with him on the brief; *Frank S. Hogan, District Attorney*), for respondent.

CALLAHAN, J. The defendant has been convicted of second degree murder after trial on an indictment charging murder in the first degree. He is presently serving a sentence of forty years to life. The defendant now appeals from the judgment of conviction because of alleged errors committed on the trial.

About 7:30 P.M. on the evening of March 13, 1949, the defendant returned to his apartment at 1479 York Avenue, New York City, showing signs of intoxication. He engaged in a quarrel with his wife, in the course of which he used loud and boisterous language, assaulted her, demolished articles of furniture, and cut up his brother-in-law's clothing with a bayonet produced from a kitchen closet. While brandishing the bayonet, he threatened that " I am going to kill. I am going to kill everybody. I'm going to kill any * * * person I see." Thereupon the defendant left the apartment and returned a short time later. On coming back to the house, he found his wife's cousin, Mrs. Day, in the apartment with her. The defendant announced that " I just killed a man," and suggested that his statement might be confirmed by looking out the front window. He produced the bayonet from under his coat. It was seen to have stains on the blade, which were not evident earlier in the evening. There were also stains upon his trousers. These stains were human blood and relatively fresh.

Shortly after 8:05 P.M. the body of William Lexa, a man about seventy-five years of age and apparently a stranger to the defendant, was found on the sidewalk in close proximity to the defendant's home. There were no witnesses to any assault upon him, and no foul play was suspected. The body was removed to the local police precinct. It was not until several hours later that the medical examiner discovered a stab wound in the chest of William Lexa as the cause of death.

In the meantime, the defendant had been arrested on his wife's charge of disorderly conduct. The very same evening he was brought before the Magistrate's Court. He pleaded guilty and was sentenced to sixty days' imprisonment, with sentence suspended on his promise to stay away from his wife. In the instant case the wife testified that she had told the arresting officer concerning the events of the evening and her husband's declaration that he had killed a man. She also testified to having informed the complaint clerk of the Magistrate's Court as to what had occurred, including the defendant's statement as to the killing of a man. While the police officer could not recall whether Mrs. McCormack had told him of this statement by the defendant, he did overhear Mrs. McCormack tell the court clerk that her husband had said that he had stabbed a man. In any event, it is clear that the wife did not testify to any such statement of her husband at the hearing before the Magistrate.

On his return to the station house about 11:15 P.M., the arresting officer for the first time learned that a man had been found dead on York Avenue near the defendant's house, and he reported to his superior the statements made by the defendant's wife before the complaint clerk at the Magistrate's Court. This led to the defendant's rearrest and subsequent indictment for the murder of William Lexa.

On the trial the People proved the events that took place in the defendant's apartment through the testimony of his wife. This testimony was received over the defendant's objection that his wife was precluded from disclosing confidential communications under section 2445 of the Penal **Law.**

On this aspect of the appeal, however, the defendant appears to limit himself to a claim of error in receipt of the wife's testimony as to what he said on his return to the apartment after the fatal stabbing. In this connection it is enough to point out that these statements made in the presence of Mrs. Day, who was in the house at the time, clearly did not rise to the level of confidential communications and were not privileged

(*People* v. *Garner,* 64 App. Div. 410, 411, affd. 169 N. Y. 585; *People* v. *Lewis,* 16 N. Y. S. 881, 884, affd. 136 N. Y. 633).

The District Attorney, however, commendably calls our attention to the necessity for deciding whether the trial court properly admitted the wife's testimony as to the earlier conduct and statements of the defendant while they were alone in the apartment. The prosecutor argues that the receipt of such evidence was proper on the ground that the occurrences and verbal outbursts were part of an abusive attack on the wife, that the defendant's announcement to the effect that he was going to kill the first person he saw had been shouted in a loud tone of voice likely to have been heard by the neighbors, and that what he did and said were not intended to be and were not confidential communications under all the circumstances.

In New York, the receipt of testimony by one spouse against the other in criminal proceedings is regulated by section 2445 of the Penal Law, which provides as follows: " The husband or wife of a person indicted or accused of a crime is in all cases a competent witness, on the examination or trial of such person; but neither husband nor wife can be compelled to disclose a confidential communication, made by one to the other during their marriage."

It will thus be seen that the statute removes the common-law disqualification of one spouse as a witness against the other in all criminal cases, but continues the cloak of privilege as to confidential communications during marriage. A literal reading of the statute would seem to permit disclosure at the discretion of the testifying spouse. Such, however, is not the law, and upon objection by the other interested party the witness cannot be compelled and has no right to make the disclosure. The conjugal privilege belongs not to the witness, but to the spouse against whom the testimony is offered (*People* v. *Wood,* 126 N. Y. 249, 271).

The statute simply bars the disclosure of confidential communications between spouses. The essence of a confidential communication is that it springs from the confidence existing between husband and wife by reason of the marital relation, and that the knowledge or information thus derived by one spouse from the other would not have been communicated except for the confidence so existing (*People* v. *Daghita,* 299 N. Y. 194, 199). " It may be difficult to frame a definition which will be applicable to all the varying circumstances of the married life. Doubtless some latitude must be given to the trial court, in determining whether the offered testimony, under the

existing circumstances of the case, involves the disclosure of matters of confidence '' (*French* v. *Ware*, 65 Vt. 338, 345; see, also, *Sexton* v. *Sexton*, 129 Iowa 487). Indeed, it is not every communication made by a husband to his wife that is regarded as confidential. The test is whether the intent exists to rely on the confidence and intimacy of the marital relation in making the disclosure to the partner of the marriage. Thus, it has been held that discussions of ordinary business transactions are not confidential (*Parkhurst* v. *Berdell*, 110 N. Y. 386), and that cruel and accusatory treatment of a wife by a husband does not come within the protection of the conjugal privilege (*Sheldon* v. *Sheldon*, 146 App. Div. 430; *Millspaugh* v. *Potter*, 62 App. Div. 521).

'' The policy of the law is to require the disclosure of all information by witnesses in order that justice may prevail. The granting of a privilege from such disclosure constitutes an exception to that general rule '' (*People ex rel. Mooney* v. *Sheriff of New York County*, 269 N. Y. 291, 295). '' The suppression of truth is a grievous necessity at best '' (*McMann* v. *Securities and Exchange Comm.*, 87 F. 2d 377, 378). And appropos of the particular question of privilege before us, we have it on the authority of *Wolfle* v. *United States* (291 U. S. 7, 14, 17) that: '' Communications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged; but wherever a communication, because of its nature or the circumstances under which it was made, was obviously not intended to be confidential, it is not a privileged communication. * * * The privilege suppresses relevant testimony and should be allowed only when it is plain that marital confidence cannot otherwise reasonably be preserved.''

The same rule finds a somewhat different manner of expression in *Yoder* v. *United States* (80 F. 2d 665, 668) as follows: '' When it is sought to elicit a communication between husband and wife, not made in the presence of others, it should be excluded unless it appears to the court, either from the method or the nature of the communication, that obviously it was not intended to be confidential.''

Considering all the circumstances of this case, we are convinced that no error was committed by the trial court in allowing the testimony of Mrs. McCormack against her husband. The method as well as the nature of the communications made by the defendant to his wife strongly militated against the view that there was anything confidential about them. The evidence

clearly shows that the occurrences within the home and in the presence of his wife alone took place in such a boisterous manner, and the braggadocian threats of the defendant to kill any and every person were shouted so loudly, that the wife called his attention to the fact that their next door neighbor could hear everything that was going on. The defendant admitted that his wife had given him this warning and, because he thought that his neighbor might be listening, he went out into the public hall and resentfully plunged the bayonet into the door of his neighbor's apartment. This act would seem to indicate that the defendant himself realized that the whole altercation with his wife, and whatever was said or done in the course of the disturbance, was not a matter of confidence between them and arising out of the marital relation. The whole quarrelsome affair, as it took place in the apartment of the parties, was not something confided by one to the other simply and specially as husband and wife, but rather something that would be performed in the presence of or communicated to any other person in the same circumstances. (See *Clements* v. *Marston,* 52 N. H. 31.)

We think that there is another circumstance indicating that the defendant did not intend to rely on the protection of the conjugal privilege as to what he did and said on the evening in question in connection with the attack upon his wife. Presumptively — and probably in fact — he knew that his wife might reveal his actions and statements, if she had him arrested for his assault upon her. The New York statute (Penal Law, § 2445) contrasted with those of many other States (see *Yoder* v. *United States,* 80 F. 2d 665, 668, *supra*) does not expressly provide for any exception to the rule of privilege so as to permit one spouse to testify against the other as to assaults or similar tortious acts upon the witness. But there can be no doubt that the common-law exception in this regard was intended to be preserved under our law. This exception was limited to prosecutions for injury to the witness spouse and was based upon the necessity to protect the injured party from injustice (8 Wigmore on Evidence [3d ed.], § 2239).

In construing our statute (Penal Law, § 2445), we are met by an inquiry as to whether the Legislature of this State intended that the common-law exception aforesaid, with its limitations, was to be left to implication, or whether it was deemed that the prohibition against disclosure of confidential communications between spouses would permit testimony concerning the *res gestae* of words and acts connected with an

assault or injury to the witness as not amounting to a communication of a confidential nature. If the latter was the intention of the Legislature, it would seem to follow that testimony of a spouse as to words uttered or acts committed in the course of a personal assault or injury by the other ought not be deemed to come within the rule of privilege in any criminal prosecution where the testimony was relevant. We are inclined to ascribe this intent to the Legislature in framing our statute. Otherwise, it would hardly have been satisfied with simply barring testimony as to confidential communications between husband and wife in criminal cases. The concrete application of this view to the present case points up the fact that any testimony which the defendant's wife could have given in the Magistrate's Court on the charge of disorderly conduct against her husband, or on a prosecution for assault to her own person, should be admissible on the instant trial of the defendant for the murder of William Lexa. If this were not the case, we would have the anomalous situation of permitting the wife's testimony in a prosecution for assault or injury to herself, but would exclude the same testimony as confidentially privileged in another prosecution for assault on a third party. But even if, contrary to the foregoing view, the common-law exception previously discussed rests entirely on implication, the defendant in this case knew that his wife might reveal his utterances and actions if she had him arrested and prosecuted for his attack upon her. Thus, it would appear in any event that no confidential communication was intended.

This brings us to another question in the case connected with possible error in the charge of the trial court. Again it is the District Attorney who raises the point with commendable fairness towards the defendant. The question relates to a refusal to charge a requested instruction to the jury " if they find that the defendant was so intoxicated as to be incapable of forming an intent to kill that they cannot find him guilty, either of murder in the first, or murder in the second degree." The refusal of the request was based on the ground that the subject had been covered in the main charge. We find that the law with respect to the effect of intoxication had been covered at length and in detail in the main charge. However, at one point in such charge the trial court, in discussing the effect of intoxication on the question of guilt, had referred only to murder in the first degree. It was this, no doubt, that brought about the request to charge aforesaid. But in other portions of the main charge the trial court had defined the various degrees of homi-

cide and had pointed out that an intent to kill was an essential element of both murder in the first degree and murder in the second degree. The trial court had also read to the jury section 1220 of the Penal Law to the effect that whenever the existence of a particular intent was a necessary element to constitute a particular degree of crime, the jury might consider that the accused was intoxicated at the time in determining the intent with which the defendant committed the act. In addition, the trial court had charged that " the intoxication need not be to such an extent as to necessarily and actually preclude the defendant from forming an intent * * *. Any intoxication may be considered by the jury, and the distinction as to its effect, or the decision as to its effect, rests with them."

The trial court's remark in the course of colloquy with defense counsel that " Intoxication would not excuse an intent to kill. A drunken man can form an intent to kill " must be considered in context and in the light of the main charge. Undoubtedly, the word " excuse " was used in the sense of " eliminate " and would be so understood by the jury. To say that " a drunken man can form an intent to kill " is correct as a general proposition of law. The trial court did not usurp the functions of the jury and take away the very question which the jury had to decide in this case. It was still left for the jury to determine the facts and apply the general principle or rule of law to the situation of this particular defendant, considering the degree of intoxication which they found to be present on the evidence before them.

In point of fact, however, the defendant did not offer any defense of intoxication. His claim was that he was elsewhere at the time Lexa was stabbed. Furthermore, the proof, insofar as it threw any light on the extent of the defendant's intoxication, would seem to indicate that he was not so grossly under the influence of liquor as to be incapable of forming an intent to kill. His own testimony would indicate a far less degree of intoxication.

Under the circumstances, and considering the charge as a whole, we find that no prejudicial error requiring reversal of the judgment was committed (*People* v. *Crumble,* 286 N. Y. 24; Code Crim. Pro., § 542).

The judgment of conviction should be affirmed in all respects.

VAN VOORHIS, J. (concurring in result). I concur in the result and in the opinion of Justice CALLAHAN, except that I think that there was error in instructing the jury upon the

subject of intoxication. In view of the meager evidence that he was completely intoxicated, however, and his apparently clear recollection of numerous details concerning his movements upon this occasion, I do not think that such error is reversible.

HEFFERNAN, J. (dissenting). The facts in this case are accurately stated in the opinion of Mr. Justice CALLAHAN and there is no necessity for their repetition here.

I am convinced that the judgment of conviction should be reversed and that appellant should be accorded a new trial.

Appellant returned to his home at about 7:30 P.M. on March 13, 1949, in a state of intoxication. He quarreled with his wife, assaulted her and demolished various household articles with a bayonet. On the trial his wife was called as a witness for the prosecution and she testified that while brandishing the bayonet he said: " I am going to kill. I am going to kill everybody. I'm going to kill any  *  *  *  person I see." This testimony was given over appellant's objection and exception.

After making these statements appellant left the apartment and returned later. I agree with Justice CALLAHAN that the statements which he made to his wife upon his return in the presence of a third person were neither privileged nor confidential.

At common law the wife of the prisoner was not a competent witness in a criminal proceeding instituted against him. The common-law rule that a husband and wife cannot be witnesses for or against each other has been modified by section 2445 of the Penal Law. That section makes a husband or wife of a person indicted or accused of crime in all cases a competent witness, but *" neither husband nor wife can be compelled to disclose a confidential communication, made by one to the other during their marriage."* (Italics supplied.)

The statute does not leave the matter of disclosing a confidential communication to the witness but the other spouse may object to any such communication and upon objection being made the witness not only cannot be compelled but has no right to make the disclosure (*People* v. *Wood*, 126 N. Y. 249).

The wife's testimony in my opinion was clearly incompetent (*People* v. *Daghita*, 299 N. Y. 194).

It seems to me that the court erred in its charge on the subject of intoxication. At the conclusion of the charge appellant's counsel made the following request: " Now, on the subject of intoxication Your Honor. I ask Your Honor to charge the jury that if they find that the defendant was so intoxicated as to be

incapable of forming an intent to kill that they cannot find him guilty, either of murder in the first, or murder in the second, degree.'' I think the court was justified in not granting this request. The court stated that it had already covered the subject in the main charge. Appellant's counsel then stated: '' Your Honor referred to murder in the first degree.'' The court then said: '' Murder in the first degree, they have to find that he had the ability to premeditate and deliberate on his act, but had an intent to kill. Intoxication would not excuse an intent to kill. A drunken man can form an intent to kill.''

It is for the jury to determine the extent of the intoxication and whether it had the effect to prevent the necessary intent, deliberation and premeditation (*People* v. *Leonardi*, 143 N. Y. 360; *People* v. *Van Zandt*, 224 N. Y. 354).

The statement of the court that '' *A drunken man can form an intent to kill* '' took from the jury the very question which it had to decide and in my judgment constitutes serious prejudicial error. (Italics supplied.)

On the argument and in his brief the prosecutor has argued that the evidence establishes that appellant is guilty. That argument has no persuasive force with me. All we know or can know is that a jury by its verdict has so found. Our only duty is to determine whether that verdict is tainted with legal error and, if so, it is our solemn duty to set it aside.

PECK, P. J., and COHN, J., concur with CALLAHAN, J.; VAN VOORHIS, J., concurs in result in opinion; HEFFERNAN, J., dissents and votes to reverse, in opinion.

Judgment affirmed.